587 So.2d 878 (1991)
Lenard Ray FISHER
v.
CITY OF EUPORA.
Larry D. WALLS
v.
CITY OF EUPORA.
Nos. 89-KA-1066, 89-KA-1067.
Supreme Court of Mississippi.
September 18, 1991.
*880 Jan R. Butler, Butler & Butler, Eupora, for appellants.
George M. Mitchell, Jr., Fortner & Mitchell, Eupora, for appellee.
Before ROY NOBLE LEE, C.J., SULLIVAN and PITTMAN, JJ.
SULLIVAN, Justice, for the Court:
This appeal involves two cases which have been consolidated. The appellants, Lenard Fisher and Larry Walls, were found guilty of separate charges of DUI in violation of Miss. Code Ann. § 63-11-30(1)(c) in the Municipal Court of Eupora on August 30, 1988, and October 11, 1988, respectively. Both appealed to the Webster County Circuit Court where their cases were tried de novo. In each case, the jury returned a verdict of guilty. The court sentenced each to nine months in the county jail. Both have appealed.

FACTS

LENARD FISHER
On August 13, 1988, Officers Wells and Bowles of the City of Eupora Police Department received a bulletin from the Sheriff's office that Lenard Fisher was on his way to Eupora from Walthall and that he was intoxicated. He was said to be driving an old green Ford pickup and it was thought that he was heading to the hospital.
Approximately five minutes later, the officers saw the truck at the red light located at Highway 9 and Fox Avenue. The truck turned east on Fox Avenue and entered the Foodway parking lot. The officers saw Fisher get out of the truck and try to get into another vehicle in the parking lot. Fisher was talking to the man in the other vehicle.
Fisher was acting in an uncoordinated manner. He had to hold onto vehicles, his speech was slurred, his eyes were bloodshot, and he smelled strongly of alcoholic beverages. The officers asked him if he was going to the hospital and he said he was not. They decided that he was intoxicated and placed him under arrest. The officers searched the truck but found no liquor. Fisher made the statement that he had just rinsed his mouth out with Listerine. The officers did in fact find some Listerine in the truck.
The arrest took place at approximately 3:25 p.m. Fisher was handcuffed and placed in the back seat of the patrol car. The events in the parking lot leading to the arrest took about eight or ten minutes. Fisher was not out of the officers' range of vision during that period. The officers said that Fisher did not take any sustenance or regurgitate.
Fisher was taken to the Webster County Jail. Officer Wells did the driving while Officer Bowles kept Fisher under observation. After arriving at the jail, the officers watched Fisher some more and then tested him on the intoxilyzer machine at 3:40 p.m. The reading obtained from testing Fisher as to his blood alcohol content was .24%.

LARRY WALLS
On September 9, 1988, Officer Bowles of the City of Eupora Police Department, while travelling on Highway 9, noticed a vehicle pass which had no tail lights. He pulled the vehicle over at the Cotton Boll restaurant. As the individual inside the car stepped out, he staggered. He had trouble finding his driver's license because of impaired coordination. Officer Bowles noticed that the individual smelled strongly of intoxicants and had red eyes. He placed the individual, Larry Walls, under arrest.
Walls was placed in the back seat of the patrol car and taken to the Webster County Sheriff's Department. It took about two minutes to get there. After arriving at the *881 Sheriff's Department, Officer Bowles observed Walls for twenty minutes. Officer Kevin Wells was with him during that period. Walls did not take any sustenance during that period nor did he regurgitate.
At the end of the twenty minute waiting period, Walls was tested on the intoxilyzer. The reading obtained from testing Walls as to his blood alcohol content was .17%.

LAW
Fisher assigns five issues as error. Walls appeals four of those same issues.

I. MAY AN ACCUSED BE CONVICTED OF DRIVING A MOTOR VEHICLE WHILE HAVING A BLOOD ALCOHOL CONTENT OF .10 PER CENT OR GREATER BASED UPON A BREATH TEST GIVEN WITH LESS THAN A FIFTEEN MINUTE OBSERVATION PERIOD FROM THE TIME OF ARREST WHEN THE TESTING PROCEDURES REQUIRE A TWENTY MINUTE OBSERVATION PERIOD?
Only Fisher appeals this issue. He contends that he was not under observation for the twenty minute period required before administration of a breath test since he was placed under arrest at 3:25 p.m. and the test was given at 3:40 p.m., a period of only fifteen minutes. His contention is actually twofold: that he was not observed for twenty minutes and that the observation was not continuous.
Officer Bowles testified that the mandatory observation period of a person charged with driving under the influence before administration of a breath test is twenty minutes. The operational checklist which is filled out by the intoxilyzer operator includes the statement, "No test shall be given to any person within 20 minutes after regurgitation or consumption of any substance by mouth." Miss. Code Ann. § 63-11-5 (Rev. 1990) states that the test shall not "be given by any officer or any agency to any person within fifteen (15) minutes of consumption of any substance by mouth."
The states which have enacted a DUI law prescribe either a fifteen minute or twenty minute waiting period during which the person charged with driving under the influence should be observed. Some courts have held that strict compliance with the observation period is necessary. Hawaii has held that the required observation period "has a direct bearing on the validity and accuracy of the test result and must be strictly complied with." State v. Takahaski, 7 Haw. App. 627, 630, 789 P.2d 1133, 1135 (1990). Texas has said that a fact issue is created where the officer did not watch the mouth of the defendant during the observation period. Gifford v. State, 793 S.W.2d 48 (Tex. App. 1990).
Other courts have applied a less strict standard. In Goode v. State, 303 Ark. 609, 798 S.W.2d 430 (1990), the defendant was stopped by a deputy who administered a series of field sobriety tests. The defendant was placed under arrest at 11:27 p.m., read his rights, handcuffed and placed in the back seat of the police car. The deputy then left the defendant for two or three minutes to inspect the defendant's car which was to be towed. After inspecting the car, the deputy got in the car with the defendant and waited for the tow truck to arrive. The drive to the sheriff's office took seven to ten minutes. The test was administered at 12:16 a.m.
The deputy testified that the observation time began when the defendant was handcuffed and placed in the car. The Arkansas court held that the deputy's testimony made a prima facie showing of substantial compliance with the Arkansas regulation requiring continuous observation for twenty minutes since "[t]he officer is not required to stare fixedly at the arrested person for the entire time in order to comply with the 20-minute regulation." Goode, 798 S.W.2d at 433.
The Kentucky Court of Appeals has labeled the twenty minute period the "eyeball" rule. In Tipton v. Commonwealth, 770 S.W.2d 239 (Ky. 1989), the Court said that the fact that the officer never left the presence of the defendant during the twenty minutes was enough to establish continuous observation. "[S]o long as the officer can observe by a presence-sense perception *882 of the arrestee, the standard operating procedures are met." Tipton, 770 S.W.2d at 242.
In State v. Smith, 16 Conn. App. 156, 547 A.2d 69 (1988), the defendant argued that he was not under continuous observation because the officer was involved in other activities during that time, i.e., driving the car, preparing the intoximeter, and filling out paperwork. The Connecticut court said that drinking, eating, smoking, and regurgitating are activities which can be perceived by the officer as long as the defendant is in his presence. To require an officer to stare at the defendant during the whole of the observation period "would not only be practically impossible to perform but would allow a subject to thwart compliance with the regulation simply by turning his head away from the observing officer." Smith, 547 A.2d at 73.
In Gilbreath v. Municipality of Anchorage, 773 P.2d 218 (Alaska 1989), the defendant's car was stuck in the snow. After he was arrested, the officers helped push his car out of the snow. They included this time in the observation period. The court said that a disagreement about compliance with the period goes to the weight of the evidence. Thus, the defendant could argue this issue to the jury.
Illinois has also held that the requirement as to the observation period is met as long as the defendant is in the presence of the officer. In the case In re Ramos, 155 Ill. App.3d 374, 108 Ill.Dec. 323, 508 N.E.2d 484 (1987), the officer observed the defendant for the twenty minute period but then had to reset the machine prior to performing the test. The officer's attention was focussed on the machine during the six minutes it took to reset the machine. The defendant argued that this was not continuous observation. The court said that the six minutes was not a serious failure to comply with the requirement since the defendant was in the presence of the officer.
The length of time that a person charged with driving under the influence must be observed prior to the administration of the breath test is mandatory. In Mississippi, by statute, that length of time is fifteen minutes; however, police procedure requires that the person be observed for twenty minutes. The observation itself can be performed as long as the defendant is in the presence of the officer. The officer is not required to stare at the defendant for the observation to be effective. A dispute as to whether the observation lasted the mandatory length of time or whether the observation was performed while in the presence of an officer goes to the weight of the testimony and the credibility of the witnesses.
Fisher disputes both. He was placed under arrest at 3:25 p.m. and the test was administered at 3:40 p.m., a period of fifteen minutes. Fisher contends that this fell short of the twenty minutes required. The testimony of Officers Bowles and Wells was that the eight to ten minute period prior to arrest was also included in the observation period. The jury could well have believed that Fisher was under observation for twenty minutes. In fact, the jury could have concluded that the observation lasted in excess of twenty minutes. The jury could also have concluded from the evidence that Fisher was under continuous observation during that period since there is no testimony that he was ever out of the presence of the officers. Furthermore, Fisher did not testify that he had taken any sustenance or had regurgitated during that time. We find no merit to this issue.

II. MAY AN ACCUSED PROPERLY BE CONVICTED OF DRIVING A MOTOR VEHICLE WHILE HAVING A BLOOD ALCOHOL CONTENT OF .10 PER CENT OR GREATER WITHOUT THE APPOINTMENT OF AN EXPERT TO ASSIST THE DEFENSE?
Prior to their trials, Fisher and Walls moved for appointment of an expert in the field of the testing device used by the City of Eupora. The court denied Walls' Motion before his trial began. There is no indication as to when Fisher's Motion was denied. Both appeal the denial, however.
*883 While the Due Process Clause requires that an indigent defendant should at times be allowed an expert in the interest of fundamental fairness, a court is not required to appoint an expert upon demand. "This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." Johnson v. State, 529 So.2d 577, 590 (Miss. 1988).
Where a request is made by an indigent defendant for an expert witness, this Court has said,
That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare. (Citations omitted)
As aptly stated in Oregon v. Acosta, 41 Or. App. 257, 597 P.2d 1282, 1284 (1979):
It is apparent that an indigent's statutorily enacted right to defense expenses is not absolute, but is conditioned upon a showing that such expenses are needed to prepare and present an adequate defense. (Citations omitted) Neither the statute nor the constitutional guarantees of effective assistance of counsel and of equal protection require that an investigator or expert be furnished at public expense upon demand. (Citations omitted) There is no single test for determining whether the services of an investigator or an expert are necessary; that decision will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed. (Citations omitted) [Emphasis theirs] Griffin v. State, 557 So.2d 542, 551 (Miss. 1990) [quoting Ruffin v. State, 447 So.2d 113, 118 (Miss. 1984)].
Some of the factors to be considered in determining if the defendant was denied a fair trial when the court did not appoint a requested expert include the degree of access the defendant has to the state's experts and whether those experts were available for rigorous cross-examination. Another consideration is the lack of prejudice or incompetence on the part of the state's experts. See Johnson v. State, 476 So.2d 1195, 1203 (Miss. 1985).
The appellants cite the United States Supreme Court case of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), as support for their argument. In that case, the Supreme Court addressed the question of whether an indigent defendant, whose only defense was insanity, should have been provided with a psychiatrist. The Court held that where a defendant's sanity is a significant factor in that defendant's defense, the state should provide the defendant with a psychiatrist.
However, this Court has not interpreted Ake to mean that an expert must be supplied any time an indigent defendant requests one. In Johnson v. State, 529 So.2d 577 (Miss. 1988), the defendant requested a fingerprint expert. We said "that there was not such a high risk of inaccuracy in fingerprint evidence as to determine in this case that the defendant was denied a fundamentally fair trial." Johnson, 529 So.2d at 592. In Griffin, supra, the defendant asked for an independent psychologist and a ballistics expert. We said that "[w]here a defendant offers no more `than undeveloped assertions that the requested assistance should be beneficial,' no trial court is under an obligation to provide him with fishing equipment." Griffin, 557 So.2d at 550 [quoting Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985)].
The Ohio Court of Appeals has addressed the question of whether a defendant charged with driving while under the influence should have been provided with an expert in intoxilyzer testing. In State v. *884 McLaughlin, 55 Ohio App.3d 141, 562 N.E.2d 1387 (1988), the court said that the defendant made no showing that an expert was needed to testify as to the accuracy of the test result. Therefore, it was not an abuse of the court's discretion to deny the defendant's request.
In their Motions, Fisher and Walls asked for "an expert in the field concerning the scientific basis, operation, calibration and interpretation of the results, including margins of error, of the breath testing device used by the Town of Eupora in this case." The renewed request made by Walls prior to trial was for "an expert to examine the breath-test machine used in this matter." These requests are no more than undeveloped assertions. The appellants made no showing that the requested assistance would benefit them in any way. The trial court did not abuse its discretion in denying the requests for an expert.

III. MAY AN ACCUSED BE SENTENCED TO SERVE THREE MONTHS IN EXCESS OF THE SIX MONTH MAXIMUM AS PROVIDED BY MISS. CODE ANN. SECTION 21-13-19 (SUPP. 1988)?
The appellants were tried under Miss. Code Ann. § 63-11-30(1)(c) (Supp. 1988), which is part of the Implied Consent Law. They contend that they should have been tried and sentenced under Miss. Code Ann. § 21-13-19 (Supp. 1988).
Section 21-13-19 deals with the power of a municipality to punish misdemeanors. It reads:
All offenses under the penal laws of this state which are misdemeanors, together with the penalty provided for violation thereof, are hereby made, without further action of the municipal authorities, criminal offenses against the municipality in whose corporate limits the offenses may have been committed to the same effect as though such offenses were made offenses against the municipality by separate ordinance in each case. However, for such misdemeanor, any penalty of incarceration is hereby limited to no more than six (6) months in jail, and any fine is hereby limited to a maximum of one thousand dollars ($1,000.00) for each violation in any case tried without a jury. Judgments for fines, costs, forfeitures and other penalties imposed by municipal courts may be enrolled by filing a certified copy of the record with the clerk of any circuit court and execution may be had thereon as provided by law for other judgments.
Section 63-11-30(2)(b) through (d), on the other hand, provides that a sentence may be enhanced for up to five years imprisonment and $5,000.00 in fines for prior convictions of driving under the influence.
The appellants cite the case of Sartain v. City of Water Valley, 528 So.2d 1125 (Miss. 1988). Sartain was convicted of the misdemeanor charge of disturbing the peace in violation of § 97-35-15 and as against the municipal ordinances of the City of Water Valley. The ordinance involved in the case provided that "[i]n no case shall the punishment exceed a fine of $300.00 or imprisonment in jail for more than 90 days, or both such fine and imprisonment." Sartain, 528 So.2d at 1127.
The City of Water Valley mounted its prosecution under the municipal ordinance. Since the appellant's sentence of five months imprisonment and a fine of $483.00 exceeded that allowed by the ordinance, the case was remanded for resentencing, although we noted that the City could amend the ordinance so as to increase the fine to $1,000.00 and the period of incarceration to six months under section 21-13-19.
A municipal court derives its jurisdiction from Miss. Code Ann. § 21-23-7 (Rev. 1990). The municipal judge is given jurisdiction
to hear and determine, without a jury and without a record of the testimony, all cases charging violations of the municipal ordinances and state misdemeanor laws made offenses against the municipality and to punish offenders therefor as may be prescribed by law. All criminal proceedings shall be brought by sworn complaint filed in the municipal court. Such complaint shall state the essential elements of the offense charges and the statute or ordinance relied upon. Such complaint shall not be required to *885 conclude with a general averment that the offense is against the peace and dignity of the state or in violation of the ordinances of the municipality.
The City of Eupora admits that § 21-13-19 gives a municipal court the authority to try misdemeanor cases. The City also agrees that, sitting without a jury, the court can only sentence a low misdemeanor to a maximum of six months incarceration. The City argues, however, that the circuit court was allowed to enhance the punishment.
This Court has allowed a sentence to be enhanced when an appeal is by trial de novo. In Jones v. City of Meridian, 552 So.2d 820 (Miss. 1989), the county court increased a $50 fine imposed by the municipal court to $250 for a breach of the peace. As support for allowing the increase, we cited the case of Smith v. State, 463 So.2d 1033 (Miss. 1984).
In Smith, we found that Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) was controlling on the issue. The defendant in Colten was convicted and fined $10 for disorderly conduct. He then exercised his right to a trial de novo at the conclusion of which he was convicted and fined $50. The Supreme Court allowed the enhanced sentencing under such a two-tiered system.
We adopted the reasoning of the Supreme Court as found in Colten.
Like Kentucky, the criminal court system in Mississippi is a two-tiered system, viz, a justice court trial, and appeal to the county court or circuit court where the accused is entitled to, and receives, a trial de novo, and different judges and juries hear the case.
In Colten, the United States Supreme Court, speaking through Justice White, said:
The right to a new trial is absolute. A defendant need not allege error in the inferior court proceeding. If he seeks a new trial, the Kentucky statutory scheme contemplates that the slate be wiped clean. Ky Rule Crim Proc. 12.06. Prosecution and defense begin anew. By the same token neither the judge nor jury that determines guilt or fixes a penalty in the trial de novo is in any way bound by the inferior court's findings or judgment. The case is to be regarded exactly as if it had been brought there in the first instance.
407 U.S. at 113, 92 S.Ct. at 1958, 32 L.Ed.2d at 591.
Smith, 463 So.2d at 1035.
In a case involving enhanced sentencing, the defendant must show that the enhancement is a result of judicial vindictiveness in order for that sentence to be overturned. Jones, 552 So.2d at 826. The sentence must also be considered in the light of the case of Anderson v. State, 381 So.2d 1019 (Miss. 1980), which allows enhancement of a sentence as long as the sentence is within statutory limits. Jones, 552 So.2d at 826.
Fisher was sentenced to one hundred and eighty days in jail and fined $616.00 plus assessments of $149.00 in Municipal Court. Walls was sentenced to serve six months in jail in Municipal Court. On appeal to the Circuit Court, each was sentenced to nine months in county jail.
The sentences imposed in Municipal Court were within the maximum penalties allowed by § 21-13-19. In Municipal Court, the penalties could not have exceeded those allowed by § 21-13-19 and they did not. However, when Fisher and Walls filed their appeals for trial de novo in the Circuit Court, they took the chance that the penalties would be greater than those allowed by § 21-13-19 since the actions were brought under § 63-11-30(1)(c). As the Supreme Court said in Colten, supra, "The case is to be regarded exactly as if it had been brought [in the Circuit Court] in the first instance." If the case had been brought in the Circuit Court in the first instance, the sentence imposed would have been according to that allowed by § 63-11-30(1)(c).
Both Fisher and Walls received enhanced sentences for prior DUI convictions. The court found that each had been convicted twice previously. Section 63-11-30(2)(c) allows a court to sentence a person convicted under subsection (1) for the third time to a *886 fine of not less than $800 nor more than $1,000 and imprisonment of not less than thirty days nor more than one year. Fisher and Walls were each sentenced to nine months in county jail by the Circuit Court. Those sentences were clearly allowable and in fact were less than the minimum allowed under § 63-11-30(2)(c) since the sentences did not include a fine.

IV. MAY AN ACCUSED BE CONVICTED ON THE BASIS OF A BREATH TEST WHICH PRESUMES A 2100 TO 1 BREATH TO BLOOD RATIO WITHOUT EVIDENCE THAT THE ACCUSED'S RATIO IS 2100 TO 1?

DOES THE BREATH TEST PRESUMPTION OF A 2100 TO 1 BREATH TO BLOOD RATIO UNDERMINE THE JURY'S RESPONSIBILITY TO FIND THE ULTIMATE FACTS BEYOND A REASONABLE DOUBT?
Fisher and Walls contend that the assumption of a 2100 to 1 breath to blood ratio creates a mandatory presumption that their breath to blood ratio is 2100 to 1. They argue that this takes the issue from the jury and requires the jury to find guilt if the test results show .10% or more by weight of alcohol in the blood.
Intoxilyzers measuring the breath to blood ratio are based on an estimated ratio of 2100 to 1. This ratio "represents the relationship between the number of alcohol molecules in the bloodstream to the number present in the breath when both substances are tested simultaneously. Thus, a 2100:1 conversion factor assumes that for each molecule of alcohol in a given volume of breath, there are 2,100 molecules of alcohol in the same volume of blood." State v. Brayman, 110 Wash.2d 183, 751 P.2d 294, 297 (1988). Factors affecting the ratio include an individual's body temperature, an individual's hematocrit level which is the ratio of the red blood cells to blood plasma, and the time the alcohol was consumed in relation to the time the test is performed. Also, a higher body temperature than normal as, for example, from a fever, will result in a lower ratio. Id.
The case of State v. Allen, 104 Or. App. 622, 802 P.2d 690 (1990), considered this precise issue. The defendant argued that the test result was based on a presumption that everyone has a partition ratio of 2100 to 1. The court rejected that argument saying an attack cannot be made on the validity of the scientific principles involved in the tests. The court said that the state must only show that the test met the standards contained in the regulations to prove the defendant's blood alcohol level by use of the breath test. The court added that a defendant is free to introduce evidence which shows that his ratio is other than 2100 to 1. "That right does not shift the burden of persuasion to him; rather, it simply gives him the opportunity to rebut the state's evidence." Allen, 104 Or. App. at 628, 802 P.2d at 694.
California has decided the question in much the same way. In People v. Cortes, 214 Cal. App.3d Supp. 12, 263 Cal. Rptr. 113 (1989), the court said that it would not create a presumption as to the accuracy of breath tests. Rather, the defendant can try to persuade the jury that he was acting in a manner which would indicate that he was sober. The court said that the defendant's ratio is not an element of the crime which has to be proven by the prosecution.
New Hampshire has a statute, RSA 265:89, which creates a presumption of intoxication on the basis of the percentage of alcohol which is in the blood. Under that statute, "evidence that there was, at the time alleged, 10/100 percent, or more by weight of alcohol in his blood, is prima facie evidence that the defendant was under the influence of intoxicating liquor." State v. Decato, 120 N.H. 358, 415 A.2d 327, 328 (1980). Vermont's statutes also create a presumption. "The presumptions are based upon scientific observations of the relationship between blood alcohol and intoxication, and they state the permissive inferences to be drawn from certain levels of alcohol. [The presumptions thus] obviate the need for expert interpretation of blood alcohol in every case." State v. Stevens, 137 Vt. 473, 408 A.2d 622, 626 (1979).
Other courts have held that their particular state's statutes create a per se violation. Wisconsin has said that the per se *887 violation means that the court does not have to allow into evidence testimony on the defendant's partition ratio. State v. McManus, 152 Wis.2d 113, 447 N.W.2d 654 (1989). Washington has said that violation of its statute is a per se violation. The statute does not create a conclusive presumption since the defendant can attack the accuracy of the test reading and the prosecution must prove the elements of the per se offense beyond a reasonable doubt. State v. Brayman, 110 Wash.2d 183, 751 P.2d 294 (1988).
No court seems to have rejected test results based on the 2100 to 1 partition ratio. The court in State v. Downie, 117 N.J. 450, 569 A.2d 242 (1990) declined to hold that the test is scientifically unreliable. The court said that the test is a reasonably accurate way to fulfill the intent of the legislature to punish those who drive while drunk. The New York courts have also declined to suppress the test results when it was argued that there are variations in the partition ratios of different individuals. "The consensus of leading researchers is that 86%  95% of the entire population are reliably within that ratio.... Although the reliability in general of the breathalyzer is no longer open to question, its accuracy in any particular case is always open to investigation at the trial." (Citations omitted). People v. Nieves, 143 Misc.2d 734, 541 N.Y.S.2d 1008, 1011 (N.Y.City Crim.Ct. 1989).
"If one were to try to place a statistical probability on the accuracy of the breath alcohol test, ... one would conclude that the chances are 86 out of 100 that the breath alcohol results are accurate or are lower than blood alcohol, and that the chances are 14 out of 100 that the results are higher than the blood alcohol concentration." 4 R. Erwin, Defense of Drunk Driving Cases § 33A.01 at 33A-6.1 (3rd ed. 1989). However, experts generally agree that a testing device which uses the 2100:1 ratio usually results in an underestimation of the amount of alcohol which is in the blood. Downie, supra, 569 A.2d at 247.
Miss. Code Ann. § 63-11-30(1) (Rev. 1990) makes it unlawful to drive while intoxicated. That section reads:
(1) It is unlawful for any person to drive or otherwise operate a vehicle within this state who (a) is under the influence of intoxicating liquor; (b) is under the influence of any other substance which has impaired such person's ability to operate a motor vehicle; or (c) has ten one-hundredths percent (.10%) or more by weight volume of alcohol in the person's blood based upon milligrams of alcohol per one hundred (100) cubic centimeters of blood as shown by a chemical analysis of such person's breath, blood or urine administered as authorized by this chapter.
In Johnston v. State, 567 So.2d 237 (Miss. 1990), we said that intoxilyzer results may be admitted into evidence if a proper foundation has been laid.
A chemical analysis of a person's breath, blood, or urine is deemed valid only when performed according to approved methods; performed by a person certified to do so; and performed on a machine certified to be accurate. Certification of the machines must take place at least quarterly. Miss.Code Anno. § 63-11-19 (1972). These safeguards insure a more accurate result in the gathering of scientific evidence through intoxilyzers and are strictly enforced. Where one of the safeguards is deficient the State bears the burden of showing that the deficiency did not affect the accuracy of the result. Gibson v. State, 458 So.2d 1046, 1047 (Miss. 1984).
Johnston, 567 So.2d at 238.
In Williams v. State, 434 So.2d 1340 (Miss. 1983), Williams challenged the validity of a breath test which had been administered to him on the basis that the police officer did not check Williams' mouth prior to the test to ascertain that he had nothing in it. This Court held that a showing by the State that the test was administered in accordance with the procedures which are recommended by the Department of Public Safety validates the results of the test. Williams' claim went to the weight of the *888 evidence rather than to the validity of the test which "revealed Williams had considerably more than .10 percent alcohol content in his blood, the statutory demarcation between a presumption of whether Williams was driving under the influence of intoxicating liquor." Williams, 434 So.2d at 1343.
Williams was decided prior to amendment of the DUI statutes by the Legislature. Under section 63-11-39 as it then existed, a showing of a ten one-hundredths percent (.10%) or more by weight of alcohol in the person's blood gave "rise to a presumption that the person was under the influence of intoxicating liquor." Effective July 1, 1983, the Legislature deleted that language and made it unlawful for a person to operate a vehicle who has ten one-hundredths percent (.10%) or more by weight volume of alcohol in the blood as shown by a chemical analysis. 1983 Gen. Laws of Miss. ch. 466. The Legislature thus mandated that a showing of.10% or more by weight volume of alcohol in the blood is a per se violation. However, according to the terms of § 63-11-39(2), a defendant may introduce any competent evidence "bearing upon the question whether or not the person was under the influence of intoxicating liquor or any other substance which had impaired such person's ability to operate a motor vehicle." Such testimony will go to the weight of the evidence.
Through their testimony, Fisher and Walls attempted to show that they were not intoxicated. Fisher testified that he had been using mouthwash for a sore tooth and that he may have swallowed it in the process. Walls testified that he had drunk only one beer about fifteen minutes before he was stopped. He also said that he was taking prescribed medication at the time of his arrest. Clearly, the jury did not believe the testimony of these two appellants.
The City introduced evidence which established the validity of the breath test. Harry Wiggs, an employee with the Department of Public Safety, testified about the calibration of the intoxilyzer. He said that he calibrated the machine once a month. Introduced into evidence was the log of the intoxilyzer showing the dates of calibration. Wiggs testified that the machine had been approved by the Commissioner of Public Safety and the Mississippi Crime Lab. The City also introduced into evidence the certificates given to the police officers who ran the test certifying that they had been trained to do so. Finally, the City provided the checklist in the case of each appellant showing that the officer who ran the test followed the correct procedures.
The appellants did not introduce any evidence concerning their particular ratios. They did not request an expert who would show that their particular ratio was not 2100 to 1; rather, they asked for an expert who was familiar with the intoxilyzer and the reliability of that machine. And although the court did not grant the appellants' Motions for an expert, cross-examination of Harry Wiggs revealed the fact that the 2100 to 1 ratio was an average and that some people have a lower or higher ratio.
The jury heard this evidence, weighed it, and in doing so, decided that Fisher and Walls were not credible witnesses. Their testimony failed to convince the jury who returned a verdict against them. We cannot say that the jury was wrong. The evidence supports the verdict.

V. MAY AN ACCUSED WHO DROVE HIS VEHICLE IN A SAFE AND PRUDENT MANNER WITHOUT ANY INDICATION OF BEING UNDER THE INFLUENCE BE CONVICTED FAIRLY BY A JURY INSTRUCTED TO CONVICT ON THE SINGLED OUT TEST?
Fisher and Walls objected to the one jury instruction which the City of Eupora submitted at their trials, Instruction S-1. That instruction reads:
The defendant, [Lenard Fisher; Larry D. Walls], has been charged with the crime of driving while under the influence of intoxicating liquor.
If you find from the evidence in this case beyond a reasonable doubt that

*889 1. the defendant, [Lenard Fisher; Larry D. Walls], was driving or operating a vehicle in the City of Eupora, Mississippi, located in Webster County, Mississippi, on the [13th; 9th] day of [August; September], 1988;
2. That at the time of such driving or operating of the said vehicle, the defendant, [Lenard Fisher; Larry D. Walls], was under the influence of intoxicating liquor in that there was a .10% or more by weight of alcohol in his blood, as determine [sic] by a chemical test,
then you shall find said defendant guilty of driving under the influence of intoxicating liquor.
If the state has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty.
The appellants contend that this instruction singles out specific evidence, i.e., the breath test. This instruction, they say, tells the jury to convict because the machine tells them to do so. As discussed previously, a conviction may be based upon intoxilyzer results if the test is administered in accordance with the proper procedures and if the defendant fails to introduce credible evidence which overcomes the statutory presumption of intoxication.
In State v. Andes, 104 Or. App. 719, 803 P.2d 273 (1990), the defendant made a similar argument about a jury instruction. In response, the court said:
The words `as shown by' are simply part of the definition of the offense. The reliability of the breath test was a contested issue at trial. The court did not instruct the jury that it must accept the breath test result as the blood alcohol content. Rather it instructed:
`As jurors, it's your sole responsibility to make all of the decisions about the facts in this case. You must evaluate the evidence to determine how reliable or believable the evidence is.'
The jury could not rationally have understood that the contested instructions meant that the breath test result was binding on it. See State v. Clark, 286 Or. 33, 36, 593 P.2d 123 (1979).
Andes, 104 Or. App. at 723, 803 P.2d at 275.
Where the jury instructions, taken as a whole, correctly state the law, there is no error. Roberts v. State, 458 So.2d 719, 728 (Miss. 1984). However, there must be an evidentiary basis for each instruction in the record. Gray v. State, 472 So.2d 409, 417 (Miss. 1985).
Fisher and Walls attacked the accuracy of the intoxilyzer results through their testimony. However, they failed to offer any instructions to that effect. In fact, they offered no instructions at all. The instruction offered by the City contained the burden of proof required of the prosecution and the elements of the crime. There was an evidentiary basis in the records to support that instruction. The court, by its own instructions, further instructed the jury that it should not "single out one instruction alone" but that it should "determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case." As in Andes, supra, these instructions clearly show that the jury did not have to believe that the test results were accurate if indeed there was evidence to the contrary.

CONCLUSION
The appellants have failed to make any showing that the breath tests were not conducted in accordance with regulations. They have also failed to show that the results were inaccurate for any other reason. The evidence in each case clearly supports the verdict of guilty. We uphold the convictions of driving under the influence of intoxicating liquor and sentences of nine months in the county jail.
CONVICTION OF DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR AND SENTENCE OF NINE (9) MONTHS IN THE COUNTY JAIL AFFIRMED AS TO LENARD FISHER; CONVICTION OF DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR AND SENTENCE OF NINE (9) MONTHS IN THE COUNTY JAIL AFFIRMED AS TO LARRY D. WALLS.
*890 ROY NOBLE LEE, C.J., and PRATHER, PITTMAN and BANKS, JJ., concur.
McRAE, J., concurs in part and dissents in part by separate written opinion joined by HAWKINS, and DAN M. LEE, JJ., and ROBERTSON, J.
McRAE, Justice, concurring in part and dissenting in part:
I concur with the majority as to affirming the convictions of both Fisher and Walls; however, I dissent as to the sentencing portion and would reverse the circuit court's sentence to the extent it exceeds the one imposed by the municipal court. The prosecution chose to go into city court, knowing that the city court could sentence the defendants to no more than six (6) months in jail. Had the prosecutors wanted a longer sentence, they could easily have taken the case to the circuit court. They did not. In so choosing, they waived their opportunity to seek a more severe sentence.
Bringing a charge in city court and then seeking an enhanced sentence when the defendant appeals to the circuit court reveals a rather devious strategy on the part of the prosecution. If a charge is first tried in circuit court, then the first sentence can be increased following an appeal only if some error requires a remand for a second trial. By bringing the charge in city court, however, the prosecution gains a chance to pursue an enhanced sentence following an appeal by the defendant even if no error occurred in the first trial, thanks to the de novo posture. The prosecution can thus place the defendant in a "box:" If the municipal court convicts and imposes a sentence, then the prosecution can threaten the defendant with an enhanced sentence  regardless of whether the city court erred  should the defendant exercise his right to appeal. To allow the prosecution to go into a non-record court, try the case, and then to tell the defendant, "If you appeal, you're going to get a higher sentence," undeniably chills the defendant's right to appeal. To allow the prosecution to wave this Damoclean sword over the heads of defendants is fundamentally unfair and is, in my view, violative of the Due Process Clause found in Miss.Const. art. 3, § 14. Once the prosecuting attorney decides to bring a charge in an inferior court, he should be precluded from asking for an enhanced sentence simply because the defendant has exercised his right to appeal. Our system will not allow a defendant to appeal directly from a non-record court directly to the Supreme Court; instead, it requires that a defendant who feels that he has been tried unjustly must subject himself to a de novo proceeding before the circuit court. This is his only appeal route. He, in effect, is "boxed," knowing the prosecutor has a strong weapon: By obtaining a solid conviction in a non-record court, the prosecutor is almost certain to obtain a higher sentence if the defendant should appeal to the circuit court.
The majority states that the defendant "assumes the risk of an increased sentence when he appeals a conviction." How else can he appeal a conviction that was wrongfully rendered against him without assuming that risk? He has no other choice. The majority is telling our citizenry in effect that the right to appeal does not apply to convictions in city court or justice court. The likelihood of an enhanced sentence has such a chilling effect that the defendant cannot freely exercise what is technically his right.
The majority relies on the Colten case to support its notion that a prosecutor may seek an enhanced sentence upon de novo review. However, Colten interprets the federal Due Process Clause and does not dictate this Court's interpretation of the due process guarantee found in Miss.Const. art. 3, § 14.
In North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the United States Supreme Court ruled that "it would be a flagrant violation" of a defendant's procedural due process rights for a state trial court to impose a heavier sentence upon reconviction in order to punish a defendant for his success in having his original conviction set aside. Pearce, 395 U.S. at 723-24, 89 S.Ct. at 2079-80. The Court further stated that

*891 "[d]ue process of law ... requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal ..., due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge."
Pearce, 395 U.S. at 725, 89 S.Ct. at 2080. Accordingly, the Court held that although the fourteenth amendment does not prohibit enhanced sentences per se, due process requires that a trial judge explicitly place in the record his reasons for imposing a more severe sentence upon reconviction. Pearce, 395 U.S. at 726, 89 S.Ct. at 2081. This measure, the Court explained, would assure the absence of vindictive motivation in resentencing and thus prevent the fear of such motivation from chilling defendants' right to appeal. Id.
The Pearce court went on to reaffirm the restrictions upon the heavier sentences after appeal:
It can hardly be doubted that it would be a flagrant violation of the Fourteenth Amendment for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside. Where, as in each of the cases before us, the original conviction has been set aside because of a constitutional error, the imposition of such a punishment, `penalizing those who choose to exercise' constitutional rights, `would be patently unconstitutional.' United States v. Jackson, 390 US 570, 581, [88 S.Ct. 1209, 1216, 20 L.Ed.2d 138, 147]. And the very threat inherent in the existence of such a punitive policy would, with respect to those still in prison, serve to `chill the exercise of basic constitutional rights.' Id., at 582, [88 S.Ct. at 1216, 20 L.Ed.2d at 147]. See also Griffin v. California, 380 U.S. 609, [85 S.Ct. 1229, 14 L.Ed.2d 106,]; cf. Johnson v. Avery, 393 U.S. 483, [89 S.Ct. 747, 21 L.Ed.2d 718].
395 U.S. at 723-24, 89 S.Ct. at 2080.
While I recognize that Colten was decided subsequently to Pearce and that it expressly held that the Due Process Clause allows a court to impose any statutorily permissible sentence upon de novo review, I do not feel it is binding in regard to this Court's interpretation of Mississippi's own due process guarantees, I would hold that under the Mississippi Due Process Clause, a convicted defendant is entitled to an appeal free from the chilling effects of prosecutorial or judicial vindictiveness. The prosecution should not be allowed to hinder the defendant's right to appeal by threatening to seek an enhanced sentence. Justice Marshall, dissenting in Colten, stated:
The Court suggests that for some reason there is less danger of vindictive sentencing on the second trial in this context than after an ordinary appeal. Specifically, the Court faults the appellant for failing to present evidence that the danger of vindictiveness is as great here as in the precise context presented in Pearce. But Pearce did not rest on evidence that most trial judges are hostile to defendants who obtain a new trial after appeal. Pearce was based, rather, on the recognition that whenever a defendant is tried twice for the same offense, there is inherent in the situation the danger of vindictive sentencing the second time around, and that this danger will deter some defendants from seeking a second trial. This danger, with its deterrent effect, is exactly the same even though the second trial takes place in a different court from the first... .
407 U.S. at 126-27, 92 S.Ct. at 1965.
Since the Colten decision, at least one state has expressly disagreed with the Colten analysis and found enhanced de novo sentences to be violative of state constitutional due process guarantees. See State v. Eden, 163 W. Va. 370, 256 S.E.2d 868 (1979). The Court in Eden imposed an absolute ban on all increased sentences, regardless of the posture of review. Id. 256 S.E.2d at 873-877. The court relied in *892 part on Justice Marshall's Colten dissent in which he refused to join the majority's position that two-tier systems carried no inherent danger of vindictiveness. Id. 256 S.E.2d at 876-77. The court in Eden concluded that a blanket prohibition on imposing increased sentences at retrial was necessary to avoid "even the appearance" of vindictive motivation. Eden, 256 S.E.2d at 874.
Under our constitution, a defendant is entitled to expect finality of his original sentence. If he wishes to appeal, he should not be faced with the dilemma of having to choose between acquiescing to trial errors on one hand and opening himself up to vindictive sentence enhancements on the other. Since our system does not permit a defendant to choose between a trial de novo and an appeal from errors committed by an inferior court, then due process requires that a de novo sentence not exceed the sentence imposed in the first trial.
I dissent from the sentencing phase of this case and would reverse it and reinstate the sentence given by the municipal court.
HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, J., join this opinion.