# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01946-COA

**THEOTUS BARNETT**                                                           **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/15/2013 |
| TRIAL JUDGE: | HON. C.E. MORGAN III |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF DELIBERATE DESIGN MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 11/03/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., CARLTON AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     An Attala County Circuit Court jury convicted Theotus Barnett of deliberate design murder, and the trial judge sentenced him to life in the custody of the Mississippi Department of Corrections.  On appeal, Barnett raises one issue: whether the trial judge's failure to grant him funds to hire an expert violated due process.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On Friday, May 25, 2007, Danny Tavares, then fifty-two years old, went to work at his family's used car lot, Tavares Motors in Kosciusko, which his father had operated before him. Tavares typically talked to his wife, Cindy, several times a day, and on this day, he last spoke to her around 1:00 p.m. Tavares usually came home early on Fridays, so when he had not come home by around 6:00 or 6:30 p.m., Cindy and their daughter, Jenny, went to check on him.

¶3.     When Cindy and Jenny arrived at Tavares Motors, they noticed that the front door of the office building was pushed out from its frame. Upon entering the building, Cindy saw that the lobby area was torn apart, a table was knocked over and broken, and there were blood stains on the carpet and walls. Cindy then saw her husband's legs protruding from the adjacent bathroom, and she found him kneeling with his head over the toilet, clutching the rim. She tried to pull him off, hoping he was alive, but his body was extremely stiff so that moving him was difficult. Once she was able to pry his body from the toilet and saw that he was dead, she called the police.

¶4.     The police and the Mississippi Bureau of Investigation took swabs from the numerous blood stains in the building. There was a large pool of blood in the lobby and significant blood spattered on the bathroom walls and floor, on the toilet seat and lid, and inside the toilet. The pattern of blood and hair on the underside of the toilet seat was consistent with the seat having been forced down on the back of Tavares's head. There was also an empty bottle of Clorox bleach, and the bleach had been poured out in the bathroom and on Tavares's body.

2

¶5.    Nearly all of the blood was Tavares's, but one sample taken from the bathroom floor was later found to match Barnett's DNA profile. Almost four years later, Barnett turned up in Tennessee, where he had been arrested and was awaiting trial on charges of aggravated kidnapping and aggravated robbery.[1] Law enforcement officers from Mississippi traveled to Tennessee to interview Barnett. The interview was recorded and transcribed, and a partially redacted version of the transcript was introduced into evidence at trial.

¶6.    In the interview, Barnett initially denied that he had ever been to Tavares Motors. However, after officers told him that DNA evidence linked him to the crime scene, Barnett admitted he had been there on the day of Tavares's death. Barnett first stated that he went there to look at a truck. Then he claimed that he went there both because he was interested in buying a truck for himself and also to confront Tavares about having "sold [his] son a lemon car" (a red Cadillac). Barnett said that things "got out of hand" after he and Tavares exchanged "words." Barnett said that Tavares accused his son of "lying," which led to shoving and a fistfight; however, Barnett told the interviewers that he "didn't get injured" in the fight and that Tavares was still alive when he left.

¶7.    As the interview progressed, Barnett claimed that the fight started because Tavares "had a mouth on him" and, specifically, called Barnett's son a "lying . . . nigger . . . son of

---

[1] In September 2010, Barnett robbed a Memphis self-storage facility after pretending to be interested in renting a storage unit. Only one employee was present at the time, and she was eight months pregnant. Barnett choked her, repeatedly struck her in the face and head with his fists and a gun, held a knife to her throat, and threatened to kill her. Barnett was convicted of aggravated robbery and aggravated kidnapping and sentenced to thirty-five years in prison, and his convictions and sentence were affirmed on appeal. *See State v. Barnett*, No. W2012-00048-CCA-R3CD, 2013 WL 2297128 (Tenn. Crim. App. May 22, 2013). No evidence of the Barnett's crimes in Tennessee was introduced at trial in this case.

3

a bitch." Barnett then said that he could not recall if Tavares ever hit him and reiterated that he was not injured in the fight. Still later, Barnett told the interviewers that Tavares initially denied having sold his son a car but eventually recalled his son, uttered the racial slur, and then told Barnett that he was "sick of talking to [him]." Barnett said "that's when . . . all hell broke loose." Barnett then claimed: "[Tavares] hit me with something, and then I don't know . . . what exactly it was but I took it from him," "[a]nd that's when I started whooping him up with it." Barnett said that Tavares hit him only once in the arm—and, again, did not injure him—with the unknown object. Barnett stated that when he took the object from Tavares and began striking him with it, he knocked Tavares into the bathroom and to the floor. Barnett then poured bleach on Tavares's body, washed his own hands, and left. Barnett claimed that he did not know whether Tavares was alive when he left. Barnett said that he could not "remember everything" that happened, but the "main part [he did] remember" was hitting Tavares with the object. In his subsequent written statement, Barnett identified the object as a leg from the broken table in the building's lobby.

¶8.     At trial, the State proved that, contrary to Barnett's claims, Tavares had never sold Barnett's son a car. Rather, about fourteen months before Tavares was killed, Barnett's son bought a red Cadillac from Lindsay's Auto Sales, a used car dealer down the street from Tavares Motors. In 2005, Barnett had also purchased a used car from Lindsay's.

¶9.     Dr. Steven Hayne performed Tavares's autopsy. At trial, Dr. Hayne testified that there were numerous bruises, scrapes, lacerations, stab wounds, and slash wounds on multiple sites on Tavares's body, including his face, head, neck, back, chest, legs, arms, and hands. Dr.

4

Hayne testified that Tavares's most extensive injuries were to his neck. Dr. Hayne found to a reasonable degree of scientific certainty that the cause of death was not blunt force trauma or stabbing. Rather, he found that the cause of death was strangulation brought on by compression of the blood vessels in the neck, which stopped blood flow to the brain. Dr. Hayne based his opinion on the significant bleeding he found in the soft tissue of the neck, including extensive hemorrhaging around the right and left carotid arteries and the jugular veins. He testified that death would have occurred within one and a half to two minutes of compression of the blood vessels and that Tavares would have lost consciousness within five to thirty seconds of compression. Dr. Hayne's opinion was consistent with the crime scene investigators' findings of blood and hair on the underside of the toilet seat (*see supra* ¶4).

¶10. The State initially indicted Barnett for capital murder, with robbery as the underlying felony.[2] On December 17, 2012, Barnett's counsel filed three motions for funds—one for "an independent expert in the fields of cause of death analysis and investigation," one for "an independent expert in the fields of DNA analysis and investigation," and one for a fact investigator.[3] A hearing on these motions was held the same day, and the court granted funds for both a DNA expert and an investigator.

¶11. At the December 17 hearing, one of Barnett's attorneys stated, "[W]hat we would like to have is an opportunity . . . to have another medical examiner go back and review Dr.

---

[2] The State later indicted Barnett for deliberate design murder and robbery and dismissed the capital murder indictment.

[3] A fourth motion for funds for a mitigation expert became moot after the State opted not to pursue the capital murder indictment.

5

Hayne's . . . reports and autopsies and procedures . . . .  You know, there may be another possible cause of death that would be a nice defense for our client."  The district attorney argued that there was no basis for such an expenditure of funds in this case.  In response, Barnett's attorney cited only Dr. Hayne's general "history" as an expert and argued that she did not "think it would . . . be cost prohibitive to have some other medical examiner review" his work in this case.  The trial judge noted that the State had only recently named a new state medical examiner, and he suggested that the new examiner review the autopsy.  One of Barnett's attorneys seemed to agree with this suggestion, but the other stated that he felt "duty bound" to ask for a completely independent expert.  However, counsel was unable to provide a name of such an expert, and so the trial judge granted Barnett four weeks to provide a name and details of the analysis that the expert would conduct.

¶12.    On December 31, 2012, the trial judge signed an order granting Barnett the funds "to obtain expert assistance in the field of cause of death analysis and investigation."  The order also stated, "The defendant shall provide the court with the name and qualifications of the proposed expert and details of the cost associated with the investigation by January 14, 2013."  On January 4, Barnett's counsel filed supplemental information with the court, which provided only the name, curriculum vitae, and hourly rate of his proposed expert.  In the supplement, Barnett asked "that he be provided adequate funding to acquire her services to review the autopsy, cause of death, and the work of the medical examiner in this matter, and to provide information that may be beneficial to Mr. Barnett."  Barnett's supplement provided no additional detail on the need for her services in this case.

6

¶13.   The record is silent as to what, if anything, occurred between the filing of the supplemental information and a pretrial hearing held on May 10, 2013.  At the end of the May 10 hearing, the following exchange occurred:

> COUNSEL:  The . . . other motion that was pending was for an independent forensic pathologist.  The Court refused to grant us funds for that.[4]  And you . . . told us at the time that if our investigation led us to believe that there was some concrete reason for one to be appointed.  We wanted one basically to review Dr. Hayne's work due mainly to the questions and concerns that had . . . been raised about his legitimacy as an expert.
>
> COURT:  Well, you can do that on [a] *Daubert* hearing. . . . You can file a motion and have a *Daubert* hearing.  And if that . . . reveals some reason we should do that, I will.  But y'all have not furnished me any reason why, why there is any debate about whether this is a homicide or not.
>
> COUNSEL:  Okay.
>
> COURT:  [T]he details of Mr. Tavares's death are out there in the autopsy.  If there is some . . . reason to believe that maybe he was shot or maybe somebody beat him or maybe he had a heart attack, then . . . that would be reason for there to be some independent forensic pathology.  Y'all have not presented me with anything other than speculation as to it at this point.  I am not going to order it on speculation.
>
> Now, if you want to file a motion for a *Daubert* hearing on Dr. Hayne, we can have a *Daubert* hearing.  And . . . if in that *Daubert* hearing something comes up that would indicate that there needs to be [an] independent analysis of it we will do that.
>
> . . . .
>
> I can't determine what you are looking for.

---

[4]   Barnett's counsel referred to the motion as both "pending" and "refused."  However, as noted above, the only motion in the record appears to have been conditionally *granted* per the trial judge's order signed on December 31, 2012.

COUNSEL:    Specifically, initially we were looking for a review of his work.

COURT:      For what purpose?

COUNSEL:    To determine if there is an issue there.

COURT:      But you gotta determine what issue you are looking for. . . . [A]ll that is . . . is a fishing expedition is what you are doing.

            . . . .

            There's nothing—you've produce nothing, no reason to fish.

COUNSEL:    Your honor, . . . what I would like the opportunity to do is revise that motion, refile it, and we can . . . revisit it later.

COURT:      Certainly, you can file whatever you want to file, but until y'all get me some more specifics than what you've got, I mean your investigator may find some reason to do that. But you've got to have some factual basis to do that. And there again, you can have a *Daubert* hearing. I prefer the *Daubert* hearing to be pretrial. We will get Dr. Hayne up here.

            . . . .

            If something comes out of that, then I will be more than happy to give you an independent pathologist. But just to do it just to say we did it for no reason, I am not going to do that at this point.

            . . . .

            I mean if it's an issue, I will get somebody to check the issue. But . . . this is way too general for me to order that at this time. I am not going to do that at this time.

¶14.   Despite the judge's repeated suggestions that Barnett request a *Daubert* hearing—which the judge specifically offered to hold prior to trial—as a means of exploring his alleged need for an independent expert, Barnett never requested such a hearing at any

8

time prior to his trial in October 2013. Nor did Barnett ever "revise" and "refile" the motion for funds or seek to "revisit [the issue] later," as counsel indicated he would. Rather, after the trial judge advised that he was not going to grant Barnett any funds "at this time," the issue was simply abandoned. On the day of trial, Barnett's counsel announced that Barnett was "withdraw[ing] any other motions that we may have pending before the court."

¶15. During Barnett's two-day trial, the State called Cindy Tavares, Dr. Hayne, the county coroner, members of the Kosciusko Police Department, the crime scene investigator from the Mississippi Bureau of Investigation, two analysts from the state crime lab, and the owner of Lindsay's Auto Sales. The jury found Barnett guilty of deliberate design murder but not guilty of robbery.[5] The trial judge then sentenced Barnett to life without parole, as required by statute.

## ANALYSIS

¶16. Barnett raises only one issue on appeal. He claims that the trial court erred by denying him funds to hire an independent forensic pathologist to rebut the testimony of the State's witness, Dr. Hayne. Barnett argues that he was entitled to funds for his independent expert because Dr. Hayne's testimony was the State's sole basis for proving the deliberate design element of the murder charge. For the reasons that follow, we disagree.

### A.    The Constitutional Right to Expert Assistance at State Expense

---

[5] The evidence of robbery was that Tavares's wallet (in which he usually kept $300 to $500) and his pocketknife were missing and never recovered. At trial, Barnett called one witness who testified that he saw someone else running from Tavares Motors the afternoon that Tavares was killed. Barnett's attorneys argued that this unidentified man may have stolen Tavares's wallet sometime after Barnett killed him.

¶17.    "Whether an indigent defendant must be provided expert funding is decided on a case-by-case basis, and we review this issue for an abuse of discretion." *Barksdale v. State*, 2013-KA-01949-COA, 2015 WL 1528975, at *4 (¶18) (Miss. Ct. App. Apr. 7, 2015) (citing *Lowe v. State*, 127 So. 3d 178, 183 (¶20) (Miss. 2013)). "[A] trial court must provide expert assistance to an indigent defendant when denial of such assistance would render the trial fundamentally unfair." *Id.* (quoting *Lowe*, 127 So. 3d at 181 (¶13)). Thus, while the State need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," he must have "access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985).

¶18.    However, "[t]his does not 'mean that an expert must be supplied any time an indigent defendant requests one.'" *Barksdale*, 2015 WL 1528975, at *4 (¶18) (quoting *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991)). Rather, "[a]n indigent's right to defense expenses is 'conditioned *upon a showing that such expenses are needed* to prepare and present an adequate defense.'" *Green v. State*, 631 So. 2d 167, 171 (Miss. 1994) (quoting *Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984)); *accord, e.g.*, *King v. State*, 960 So. 2d 413, 422 (¶10) (Miss. 2007) (defendant must establish a "substantial need" for expert assistance). "Concrete reasons for requiring an expert must be provided by the accused." *Green*, 631 So. 2d at 171 (citing *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991)). Accordingly, a court does not abuse its discretion by denying funds when an indigent defendant offers only "unsubstantiated assertions that assistance would be beneficial." *Brown v. State*, 152 So. 3d 1146, 1166 (¶90) (Miss. 2014) (quoting *Harrison v. State*, 635

10

So. 2d 894, 901 (Miss. 1994)); *see also Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) ("Given that [the indigent defendant] offered little more than undeveloped assertions that the requested [expert] assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [denying funds].").

¶19.    When an indigent defendant is denied expert assistance despite having articulated a concrete need for it, our Supreme Court has identified several factors as relevant to "determining whether [he] was denied a fair trial because of the failure to appoint or allow funds for an expert." *Townsend v. State*, 847 So. 2d 825, 829 (¶13) (Miss. 2003). "[S]ome of the factors to consider are whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts." *Id.* (citing *Fisher*, 587 So. 2d at 883). "[The Supreme] Court has also considered to what extent the State's case depends upon the State's expert, and the risk of error in resolving the issue for which the expert is requested." *Id.* (citing *Tubbs v. State*, 402 So. 2d 830, 836 (Miss. 1981); *Johnson v. State*, 529 So. 2d 577, 592 (Miss. 1988)); *see also Brandon v. State*, 109 So. 3d 128, 133 (¶16) (Miss. Ct. App. 2013) (trial judge properly "considered the factors from *Townsend*").[6]

¶20.    Barnett argues that he was entitled to an independent forensic pathologist, at county expense, because the State relied on Dr. Hayne's testimony to prove the deliberate design element of the murder charge. Barnett principally relies on three recent Mississippi Supreme Court decisions on the scope of an indigent defendant's right to expert assistance at public

---

[6] Barnett recites these factors in his opening brief but only addresses the significance of Dr. Hayne's testimony to the State's case.

expense: *Lowe v. State*,[7] *Brown v. State*,[8] and *Isham v. State*.[9]  However, Barnett's reliance

on these three decisions—which we discuss in detail below—is misplaced, as all three are

distinguishable in relevant and significant respects.

### B.    The Mississippi Supreme Court's Recent Decisions in *Lowe*, *Brown*, and *Isham*

¶21.    *Brown* and *Isham* each involved a young child (six months old and two years old,

respectively) rushed to the hospital with serious internal injuries, but no visible external

injuries, after being alone in the care of a parent or stepparent.  *See Isham*, 161 So. 3d at

1077-78 (¶¶2-8); *Brown*, 152 So. 3d at 1149-50 (¶¶2-6).  In *Brown*, Dr. Hayne testified that

the child's injuries were consistent with "Shaken Baby Syndrome," and in *Isham* experts

testified that the child's injuries were caused by abusive blunt force trauma to the head, rather

than an accidental fall or some other cause.  *See Isham*, 161 So. 3d at 1079-80 (¶¶14-17);

*Brown*, 152 So. 3d at 1155-58 (¶¶41-49).  In each case, the defendant denied having ever

---

[7] *Lowe*, 127 So. 3d at 181 (¶13) ("[T]he circuit court deprived Lowe of a fundamentally fair trial by denying him the assistance of a computer forensics expert when the State relied exclusively on its own expert to identify Lowe as the perpetrator[.]").

[8] *Brown*, 152 So. 3d at 1167 (¶93) ("Dr. Hayne offered the only evidence on both the underlying felony of child abuse and the cause and manner of death, and Brown had no way to rebut it.").

[9] *Isham v. State*, 161 So. 3d 1076, 1083 (¶34) (Miss. 2015) (denial of expert assistance violated due process because it was "unquestionable that the State's experts were the only source of testimony concerning . . . essential components of the prosecution's proof," i.e., proof that Isham physically abused his stepchild and caused his injuries "to the exclusion of every reasonable hypothesis consistent with innocence"); *see also id.* at (¶33) ("The mandate of *Lowe* and *Brown* is abundantly clear: if the State relies on expert testimony alone to prove or corroborate an element of the crime, then the defendant is entitled to an expert to assist in his defense and preparation for cross-examination.").

abused the child, and there were no witnesses to any alleged abuse. Thus, in each case, the prosecution's case was purely circumstantial and rested entirely on whether the jury believed its experts. *See Isham*, 161 So. 3d at 1083 (¶34); *Brown*, 152 So. 3d at 1164 (¶83).

¶22. In *Brown*, the Court held that the trial court's denial of funds for a defense expert was an abuse of discretion and a denial of due process because "Dr. Hayne offered the *only* evidence on both the underlying felony of child abuse and the cause and manner of death, and Brown had no way to rebut it." *Brown*, 152 So. 3d at 1167 (¶93) (emphasis added); *see also id.* at 1170 (¶107) (Kitchens, J., joined by all other Justices, specially concurring) ("Utilization of an expert witness was the *only* way that Brown could defend himself against the testimony of Dr. Hayne."). Indeed, the Court reasoned that, given the nature of Dr. Hayne's testimony in that case, Brown needed his own expert "even to determine the proper questions to ask to challenge [him] on cross." *Brown*, 152 So. 3d at 1166 (¶92) (majority opinion).

¶23. Notably, in *Brown*, the Supreme Court specifically distinguished Brown's claim from the claim that this Court rejected in *McFadden v. State*, 929 So. 2d 365 (Miss. Ct. App. 2006). *See Brown*, 152 So. 3d at 1167 (¶94). *McFadden* also involved allegations of child abuse, with Dr. Hayne as the State's expert witness. *See McFadden*, 929 So. 2d at 367-69 (¶¶3-14). However, in that case, we affirmed the trial court's denial of expert assistance, finding that the defendant had failed to show that such assistance was necessary to his defense. *See id.* at 368-69 (¶¶9-14). And in *Brown*, the Supreme Court specifically recognized that *McFadden* was distinguishable for two reasons: unlike Brown, McFadden

13

(1) "had changed his story several times about how the injuries to the child occurred" and also (2) *admitted* to having caused the child's death and disputed only the precise manner or cause of death. *Brown*, 152 So. 3d at 1167 (¶94).

¶24. One year later, the Supreme Court applied *Brown*'s reasoning to *Isham*'s similar facts. The Court said that *Brown*'s "mandate . . . is clear: if the State relies on expert testimony alone to prove or corroborate an element of the crime, then the defendant is entitled to an expert to assist in his defense and preparation for cross-examination." *Isham*, 161 So. 3d at 1083 (¶33). As in *Brown*, because "the State's experts were the only source of . . . proof" that the child's injuries resulted from abuse and not some other cause, the defendant was entitled to expert assistance of his own as a matter of due process. *Isham*, 161 So. 3d at 1083 (¶34). Because "[t]he State could not have proved its case against Isham without expert testimony, . . . the trial court deprived Isham of his right to a fair trial when it denied him funds to procure opposing experts." *Id.* at 1084 (¶38). Moreover, Isham had provided the trial judge with concrete reasons why he needed funds for an expert by identifying experts who would offer specific alternative causes (medical conditions) for the child's injuries. *See id.* at (¶37).

¶25. Finally, *Lowe* was a different type of case but involved a similar need for an expert. Lowe was charged with downloading child pornography to his computer, but he offered proof that numerous others had access to and used his computer. *See Lowe*, 127 So. 3d at 179-80 (¶¶3-9). No witnesses claimed personal knowledge that Lowe downloaded such material; rather, the State's case rested entirely on its expert's opinion that the "digital

14

fingerprint"—i.e., the times, passwords, and networks that the expert associated with the downloads—"pointed to Lowe as the individual who had downloaded the files." *Id.* at 180-81, 183 (¶¶11, 21). When Lowe initially requested funds for expert assistance, the trial court directed his attorney to speak with the State's expert first; however, the State's expert refused to discuss the specifics of his forensic analysis and was unwilling to meet until two weeks prior to the trial date. *Id.* at 180 (¶7). Nonetheless, the trial court denied Lowe's request for funds. *Id.* at (¶8).

¶26.    On appeal, the Supreme Court held that the trial court's denial of Lowe's renewed motion for expert assistance was an abuse of discretion because "the State relied *solely* on . . . its expert to establish that the files existed on Lowe's laptop and that Lowe, rather than another individual using his laptop, downloaded the images from the internet." *Id.* at 183 (¶21) (emphasis added). Put simply, "the State could not have convicted Lowe" without the expert, and yet Lowe had no reasonable means of cross-examining him or rebutting his testimony. *Id.* at (¶¶21-22). The Supreme Court also emphasized that "Lowe's counsel repeatedly explained to the trial court . . . *specific needs* for an independent expert in computer forensics"—i.e., "to examine the computer's hard drive and to refute the State expert's allegations that the hard drive contained [child pornography]," and "to determine who downloaded the content and under what user name and password." *Id.* at (¶22) (emphasis added).

        **C.**    **Whether Barnett provided concrete reasons why he needed expert assistance and whether the denial of such assistance rendered his trial fundamentally unfair.**

15

¶27. At the outset, we are tempted to conclude that Barnett waived his only claim on appeal by failing to develop it in the trial court. As discussed above, the trial judge specifically urged Barnett to notice a hearing at which he could cross-examine Dr. Hayne and thereby develop his need, if any, for independent expert assistance. For instance, the trial judge stated, "[Y]ou can have a *Daubert* hearing [prior to trial]. . . . We will get Dr. Hayne up here." The judge continued, "If something comes out of that, then I will be more than happy to give you an independent pathologist." The judge explained that he thought that a hearing was necessary because he could not "determine what [Barnett's was] looking for"—i.e., what assistance Barnett thought an expert could provide. The judge's comments are certainly understandable given that Barnett did not seem to know either. At the first hearing on the motion, his attorneys offered only speculation that "there may be another possible cause of death that would be a nice defense." Months later, counsel still could only say that they wanted a "review" "[t]o determine if there [was] any issue." The judge responded that this was "way too general," and so he was not going to grant the request "at this time"—and he again urged Barnett to notice a hearing. Barnett's counsel said that he would "revise" and "refile" the motion, but he never did. The trial judge's urging to develop the record and his offers to hold a hearing were simply ignored.

¶28. Moreover, "[t]he well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Moffett v. State*, 49 So. 3d 1073, 1088 (¶41) (Miss. 2010) (quoting *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985)). In this case, it is far from clear that the issue raised on appeal is the same "matter . . . presented to [the

16

trial judge] for decision." *Id.* On appeal, Barnett argues that an independent expert might have disagreed with Dr. Hayne's finding that Tavares was strangled, which might have bolstered Barnett's "theory of . . . manslaughter." For reasons explained below, we find this argument unpersuasive, but we first note that the issue was never articulated to the trial judge in these terms. Again, defense counsel simply stated that they wanted someone to "review" Dr. Hayne's opinions or that some other "possible cause of death" might be helpful to Barnett in some unspecified way. The trial judge questioned whether there was "reason to believe that maybe [Tavares] was shot or maybe somebody beat him or maybe he had a heart attack," but Barnett provided no clarification in response. Prior to trial, Barnett never articulated his theory of the defense or why he thought the precise cause of death was important in this case; rather, he simply asked the trial judge to rule that he was entitled to funds for an independent forensic pathologist because Dr. Hayne was the State's expert.

¶29. Thus, Barnett not only failed to avail himself of the trial judge's express invitation to develop the factual basis of his claim but also failed to present the claim to the trial judge with any degree of particularity. This arguably amounts to a waiver of the claim. In any event, it clearly demonstrates that Barnett failed to meet his burden of showing a "substantial need" for expert assistance. *King*, 960 So. 2d at 422 (¶10). "Concrete reasons for requiring an expert *must* be provided by the accused." *Green*, 631 So. 2d at 171 (emphasis added). Barnett failed to support his motion with any concrete reasons. Because Barnett made only "unsubstantiated assertions that assistance would be beneficial," the trial judge did not abuse his discretion by denying the request for funds. *Brown*, 152 So. 3d at 1166 (¶90) (quoting

17

*Harrison*, 635 So. 2d at 901); *accord Caldwell*, 472 U.S. at 323 n.1. Indeed, in a prior case in which the only "reason given for [trial] counsel's request for a state-funded expert was that she wanted to challenge Dr. Hayne's autopsy," we affirmed the trial judge's ruling that the defendant had "failed to show a concrete need why a state-funded expert [should] be provided." *Brandon*, 109 So. 3d at 132-33 (¶¶15-16).

¶30. Barnett's failure to provide any concrete need for an expert distinguishes this case from *Lowe*, *Brown*, and *Isham*. The defendant in *Lowe* explained that he needed an expert to rebut the State's expert testimony that child pornography was downloaded to his computer and that he, as opposed to someone else, had downloaded it. *Lowe*, 127 So. 3d at 183 (¶22). In both *Brown* and *Isham*, the defendant needed an expert to rebut the State's expert testimony that the victim's injuries were the result of child abuse, rather than some other cause. *See Isham*, 161 So. 3d at 1084 (¶¶36-37); *Brown*, 152 So. 3d at 1166-67 (¶¶92-94). Here, in contrast, Barnett simply asserted—without explanation—that an expert might identify some other possible cause of death which might be helpful to him. Such assertions are insufficient to establish a substantial need for the testimony.

¶31. Moreover, the cases on which Barnett relies are also distinguishable because the State's case against Barnett did not rest entirely or even primarily on Dr. Hayne's testimony. Barnett argues that he is entitled to relief under the holdings of *Lowe*, *Brown*, and *Isham* because the State relied solely on Dr. Hayne's testimony to prove the deliberate design element of the murder charge. Specifically, Barnett emphasizes that in his closing argument, the assistant district attorney characterized Dr. Hayne's testimony that Tavares was strangled

18

as "the most damning evidence" against Barnett. However, although the assistant district attorney ultimately turned to Dr. Hayne's testimony, he first emphasized the many inconsistencies and apparent contradictions in Barnett's own version of events as well as the brutal nature of the attack as a whole—the significant blood throughout the lobby and bathroom, including a large pool of blood in the lobby area, and the numerous wounds that Barnett inflicted on Tavares before he died. Thus, although Dr. Hayne's testimony was certainly cited as evidence, it was far from the *only* evidence that the State offered to convict Barnett of deliberate design murder.

¶32. DNA evidence placed Barnett at the scene, and—after he changed his story more than once—Barnett admitted that he killed Tavares. Specifically, he admitted beating Tavares to the ground and then pouring Clorox on him as he lay motionless on the bathroom floor. Thus, Barnett's own changing statements to law enforcement provided ample evidence that he murdered Tavares. As the Supreme Court recognized in *Brown*, once the defendant has not only admitted that he killed the victim but also "changed his story several times about how the [crime] occurred," expert testimony concerning the precise cause of death is no longer so essential to the State's case that the defendant is entitled to funds for an expert. *Brown*, 152 So. 3d at 1167 (¶94) (citing *McFadden*, 929 So. 2d at 367-69 (¶¶3-14)); *see also Lowe*, 127 So. 3d at 184 (¶24) (holding that a defendant is entitled to his own expert where "the State relies on expert testimony *alone* to connect the defendant to the offense charged" (emphasis added)).

¶33. Beyond Barnett's own statements, additional evidence supported the jury's verdict

19

finding Barnett guilty of deliberate design murder. As our Supreme Court has explained, "Deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Brown v. State*, 965 So. 2d 1023, 1030 (¶28) (Miss. 2007) (quotation marks and brackets omitted). Deliberate design "may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." *Id.* The blood and hair found on the underside of the toilet seat indicated that the seat had been forced down on Tavares's head. The blood that had pooled and spattered throughout the lobby and bathroom and Tavares's many injuries showed that Barnett beat Tavares brutally and thoroughly. In addition, almost all of the blood at the crime scene was Tavares's, and crime scene investigators recovered only one small sample of Barnett's DNA. Barnett himself told law enforcement that Tavares never hit him (or maybe hit him once) and did not injure him. After Barnett had killed Tavares, he washed his hands and poured Clorox on the body before leaving. All of this was evidence of deliberate design murder.[10] Thus, unlike in *Lowe*, *Brown*, and *Isham*, the expert testimony in this case was far from the only evidence on which the State relied to prove its case.

¶34. This case is also distinguishable from *Lowe*, *Brown*, and *Isham* in that Barnett was able to advance his theory of defense through "rigorous cross-examination" of Dr. Hayne. *Isham*, 161 So. 3d at 1084 (¶34). This case did not involve complex or highly technical

---

[10] *See, e.g.*, *Westbrook v. State*, 29 So. 3d 828, 832 (¶11) (Miss. Ct. App. 2009) (jury could infer deliberate design from the fact that the defendant struck the unarmed victim three times with a baseball bat); *Wright v. State*, 915 So. 2d 527, 531 (¶8) (Miss. Ct. App. 2005) (jury could infer deliberate design from the severity of the victim's injuries and the defendant's use of a broken bottle and wooden tray).

issues of computer forensics and "digital fingerprinting," the validity or applicability of "Shaken Baby Syndrome," or a claim that a small child's unwitnessed internal injuries were the result of a medical condition. The issue at trial was whether deliberate design could be inferred from the evidence of a brutal killing to which Barnett admitted. Barnett's counsel was able to advance Barnett's position on this issue through cross-examination of Dr. Hayne. For example, Dr. Hayne admitted on cross-examination that he could testify only that his findings were "consistent with strangulation," which he acknowledged meant that there was some degree of uncertainty as to the cause of death. Dr. Hayne also admitted that some of the usual signs of strangulation were not present—for example, there was no definitive line around the neck and no apparent facial swelling. Thus, Barnett's theory of what the physical evidence showed—that he beat Tavares brutally and thoroughly but without malice or deliberate design—was fairly presented through cross-examination. *See King*, 960 So. 2d at 422-23 (¶10) (defendant failed to show a substantial need for an independent expert pathologist where the State's expert admitted on cross-examination that the defendant's theory was possible); *King v. State*, 784 So. 2d 884, 888-89 (¶15-18) (Miss. 2001) (same).

¶35.    Finally, "whether and to what degree the defendant had access to the State's experts" is a factor to be considered in determining whether there is a substantial need for funds for an independent expert. *McFadden*, 929 So. 2d at 368 (¶12) (citing *Townsend*, 847 So. 2d at 829 (¶13)). In this case, as discussed above, the trial judge offered Barnett an opportunity to explore Dr. Hayne's opinions at a pretrial hearing. *See Wilkerson v. State*, 731 So. 2d 1173, 1179 (¶19) (Miss. 1999) (trial judge's orders granting the defendant an opportunity to

depose all of the State's expert witnesses weighed against the need for an independent expert). That Barnett failed to avail himself of that opportunity does not alter the fact that the court expressly offered him meaningful pretrial access to Dr. Hayne.[11]

**CONCLUSION**

¶36. The trial judge did not abuse his discretion by denying Barnett's motion for public funds to retain an independent forensic pathologist. First, the trial judge's ruling was not an abuse of discretion because Barnett offered no concrete reason why such assistance was necessary to an adequate defense—indeed, Barnett arguably waived the claim by failing to develop the issue and articulate the claim clearly in the trial court. Second, the trial judge's ruling was not an abuse of discretion because Dr. Hayne's testimony was not essential to the State's case, the State presented ample additional evidence of deliberate design, Barnett was able to present his theory of manslaughter through cross-examination, and Barnett was offered meaningful pretrial access to Dr. Hayne. Accordingly, we find no error and affirm Barnett's conviction and sentence.

¶37. **THE JUDGMENT OF THE CIRCUIT COURT OF ATTALA COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF**

---

[11] The Supreme Court has also listed the "lack of prejudice or incompetence of the State's experts" as a factor to be considered. *Townsend*, 847 So. 2d at 829 (¶13). While "[w]e acknowledge that Dr. Hayne's work has received criticism," "we note [that] the [S]upreme [C]ourt [has] made abundantly clear that '*Dr. Hayne is qualified to proffer expert opinions in forensic pathology*[.]'" *Cooper v. State*, 76 So. 3d 749, 755 (¶24) (Miss. Ct. App. 2011) (quoting *Edmonds v. State*, 955 So. 2d 787, 792 (¶8) (Miss. 2007)) (emphasis added in *Cooper*). "And since *Edmonds*, the [S]upreme [C]ourt has consistently found Dr. Hayne qualified to render expert opinions in the field of forensic pathology in criminal cases." *Cooper*, 76 So. 3d at 755 (¶24) (collecting additional cases). Dr. Hayne's opinions in this case were restricted to issues of forensic pathology, and Barnett did not object to his being allowed to testify as an expert in that field.

**THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ATTALA COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**