# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00185-COA

**JOSHUA LOWRY CARR A/K/A JOSHUA L. CARR A/K/A JOSHUA CARR**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/12/2024 |
| TRIAL JUDGE: | HON. BRAD ASHLEY TOUCHSTONE |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/06/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND ST. PÉ, JJ.**

**ST. PÉ, J., FOR THE COURT:**

¶1.    Joshua Carr was charged with and found guilty of fondling three of his nieces and committing sexual battery against one of them. On appeal, he argues that he was entitled to funds to hire an expert witness, that the trial court erred by allowing testimony about other alleged bad acts, that his conviction of fondling one niece merges with the conviction of sexual battery of the same niece, and that his indictment was insufficient for him to prepare an adequate defense. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Carr was indicted in Pearl River County on three counts of child molestation under

Mississippi Code Annotated section 97-5-23 (Rev. 2020) and one count of sexual battery under section 97-3-95(1)(d) (Rev. 2020). The indictment alleged that Count I occurred between January 1, 2018, and March 30, 2021, and that Carr had "handle[d], touch[ed], or rub[bed] with his hand the genitals of [Amy].[1]" Count II alleged the same dates and that Carr had "handle[d], touch[ed], or rub[bed] with his hand the breasts of [Jane]." Count III alleged the same dates and that Carr had "handle[d], touch[ed], or rub[bed] with his hand the genitals of [Kate]." Count IV alleged that Carr was older than 18 and had "digitally penetrated the genitals of [Kate]" at a time when she was younger than 14 and he was more than 24 months older than her.

*Abuse Allegations*

¶3.    Amy and Jane's mother (and Kate's stepmother) is Jennifer, and her sister Samantha had been married to Carr for most of Jennifer's kids' lives. Jennifer had known him for about eighteen years. She described their relationship as "really close." At one point, Jennifer, her husband Shaun, and their four kids lived with Carr, Samantha, and their three kids.  They later moved across the street from Samantha and Carr, and they were "always together" at one another's houses. It was not unusual for her girls to be at Carr's house or to be alone with Carr. She said that sometimes Carr would go into his room to watch a movie if he did not feel like hanging out with the rest of the family, and he would ask the girls to come into the room to watch a movie with him.

---

[1] We use the aliases as given by the parties to protect the victims of sexual abuse.

¶4.     Jennifer testified that on May 27, 2021, the girls had gone on a long walk and were upset when they got home. She could tell that Jane had been crying, and Jennifer asked what was wrong. Jane asked for a "family meeting," which Jennifer explained was their family's way of creating a safe, judgment-free space for the children. Jennifer asked why they needed to meet, and Jane's knees buckled as she told Jennifer, "Mom, it's bad." At the family meeting, the girls told Jennifer that Carr "had been doing inappropriate things to them . . . that he was touching their private parts and that he was making them touch his."

¶5.     Jennifer testified that a few years before this, in 2016 or 2017, Jane told her that she was not comfortable around Carr. Jennifer said that they were living across the street from Carr at the time. The adults were at Carr's house, and the children were watching movies at her house. Jennifer testified that the adults realized Carr was no longer with them. She and her father went across the street to get some Diet Coke, and when she went inside, she found Carr watching a movie with the kids. Jennifer testified that Carr was in a chair with Jane in his lap and that there was a blanket covering her.

¶6.     Jane was upset and crying. While Jennifer's father yelled at Carr that it was "inappropriate" for him to be alone with the kids while all the adults were across the street, Jennifer spoke to Jane. Jane said that Carr had been rubbing her back and that he "had put his hand on the inside of her panty line on her back" near her bottom. Jennifer testified that she "honestly did not put too much thought into it at that moment." She said Carr had been drinking, and he often rubbed the kids' backs. But she did speak to her sister Samantha. She

told Samantha that she did not want Carr to have the kids on his lap or under blankets anymore. Carr denied doing anything wrong and was angry at their suggestions.

¶7.　　On cross-examination, Jennifer testified that Samantha did not initially believe the girls' allegations, but Samantha changed her mind after their other sister's daughter disclosed that she too had been touched. Jennifer said that the girls have not changed their story since first disclosing it, and she had not encouraged them to fabricate the story.

¶8.　　Amy testified that Carr started abusing her when she was seven or eight years old and that it continued until she was thirteen. She said that Carr would touch her breasts and her "private part" and that it happened more than once. She testified that she and Carr would sometimes be alone together in his room, and he would cover them with a blanket. Sometimes her sisters would be there too, but Kate was more likely to be there than Jane. She said they saw him touch her. She said it was sometimes on top of her clothes and sometimes underneath. He used his hands, and he did not say anything. At least once, Carr forced her to put her hands on his "private part."

¶9.　　Whenever she tried to get out from under the covers, Carr would tell her she would get cold; if she tried to leave the room, he would tell her that the movie was not over yet. Sometimes, when Carr was drunk, he would grab Amy's behind and try to make out with her. The last time he had kissed her was New Year's in 2021.

¶10.　　Amy said she felt very upset by the New Year's incident, and sometime after, she and her sisters went on a walk and somehow began talking about it. She said talking about it then

4

and now made her feel sick. Amy testified that she had not told anyone before that because she was afraid to ruin her family. She testified that it had been hard since she disclosed the abuse because she could not see everyone in her family anymore.

¶11. On cross-examination, Amy testified that she had seen Carr with her sisters too. If they were all in the bed, she would see Carr touching them the same way he had touched her. She saw him kiss Kate with his tongue, too. Amy said that the abuse got worse after they moved across the street from Carr's house. Amy did not know at the time the abuse was happening that it was wrong.

¶12. Jane testified that Carr began abusing her when she was eight or nine. She did not know the exact date it started. Jane testified that Carr would touch her breasts and "between [her] legs," but usually only the outside of her clothes. She testified that the abuse was happening "a lot." Jane testified that sometimes Carr put her on his lap "on top of him" and would kiss her on the lips, rub her back, and rub her bottom. She had her clothes on, but his were off. He often told her he loved her.

¶13. Jane said the abuse happened in his bedroom or on the couch in the living room. Usually, no one else was there, but sometimes one of his daughters would be there too when they were infants or toddlers. Sometimes, Carr would wear only his underwear. Carr covered them with a blanket. She testified that Carr would ask her if she wanted to "snuggle" before they got on the couch or bed. If she said she did not want to, he would "get upset."

¶14. Jane testified that the day she and her sisters disclosed the abuse, they had taken a

walk. She did not remember how it came up, but one of her sisters mentioned that Carr made her uncomfortable. Jane asked if anything had happened to the other girls, and they both said yes. When they all realized what was going on, Jane decided to tell her mom. She did not know that it had been happening to her sisters too. She had never planned to tell anyone because she was embarrassed and worried what would happen to the family, but when she realized her sisters were being abused too, she decided to speak up.

¶15.   Kate testified that Carr began abusing her when she was six or seven and that it happened more than once over the years. She could not say how many times it happened, but she knew that the last time was in 2019 or 2020. She testified that Carr used his hand to touch her chest and vagina—her "private areas"—both on top of and under her clothes. This usually happened in the bed in his room. She said that sometimes he had his hand in her pants, but other times his finger would "go, like, in between [her] lips." The State asked her to clarify, and she said, "The lips for, like your vagina kind of like covering, like, the holes, I guess you could say." She clarified on cross that his finger went "in between the lips of her vagina" but that he never went "inside of [her] vagina." She did not know what "penetrating" meant; she guessed that it meant "touching."

¶16.   Kate said the abuse happened mostly in Carr's bedroom. He would ask if she wanted to watch a movie and snuggle, and when they lay down on the bed, he would start to touch her. Sometimes he made her touch his penis under his clothes. He would put her hand on him, and when she tried to move it, he would "force [her] hand back down."

6

*Expert Witness*

¶17.    Kaitlyn Jewell, the forensic interviewer for Hope Haven Child Advocacy Center, testified as an expert in forensic interviews. She testified that they had received a referral from law enforcement for the girls, and she explained the general process of interviewing. At the time of the interview, June 2021, Kate was thirteen, Jane was fourteen, and Amy was thirteen. Each girl made a disclosure during the interview about improper touching by their uncle, Carr.

¶18.    Jewell did not think it was odd that none of the girls had disclosed Carr's abuse previously. She testified that it was "a process for a lot of children," and that it often took time for children to "finally feel comfortable enough to come forward about things." Jewell concluded that the girls were "consistent with sharing information that they were being touched inappropriately." She recommended to law enforcement that they continue the investigation and that there be no further contact with Carr. Jewell explained that it was not her job to determine whether a crime had been committed; her job was to gain information from the children to pass along to law enforcement.

¶19.    Jewell was cross-examined about the form she completed for each interview. In each instance, she did not mark that digital penetration, fondling, or kissing had taken place but wrote "touching private parts." She testified that the girls had disclosed that their uncle kissed them even though she did not mark it. She said that "it was a mistake that I actually did not catch until right now." She saw no signs that the girls had been coached or otherwise

7

told what to say.

*Prior Bad Acts Witnesses*[2]

¶20. Jennifer and Samantha's niece Molly testified that when she was twelve or fourteen, and was in Mississippi for vacation, Carr would touch her in ways that made her uncomfortable. She testified that once Carr asked her to lie on a trampoline with him to look at stars and that he rested his hand on her breasts for at least a minute. As they lay there, he started to move his hand to the top of her underwear, but they were interrupted by Amy. When Amy went back inside, he tried to put his hand in her shorts again, and this time he was successful. He touched her vaginal area on top of her underwear. Molly said she froze because she did not understand or know what to do. He started to move his hand under her underwear, but Molly "freaked out" and made him stop.

¶21. Deanna, Carr's second cousin, testified that she visited family in Mississippi when she was roughly eleven or twelve. During her visit, Carr gave her a drink containing alcohol and lied to her when she asked if it was alcoholic. She was driving a four-wheeler, and Carr was riding behind her. As they rode, he put his hands in her pants on the outside of her underwear. When she questioned him, he told her his hand was cold. She did not tell anyone because she thought it was just a "drunken mistake," since she thought everyone in his family had a drinking problem.

---

[2] The Appellant's Brief does not assign aliases to these witnesses and refers to them by their initials. The State instead adopted aliases (Molly and Deanna) for I.J. and A.L., respectively.

*Carr's Testimony*

¶22.   Carr testified that Jennifer, Shaun, and their children moved in with him and Samantha sometime between 2017 and 2019 and lived with them for roughly a year. Carr and Samantha slept in their room; their kids slept in their rooms; Jennifer and Shaun slept on a mattress in the living room; and Jennifer and Shaun's kids slept "between the couch and children's bedrooms." He testified that there were TVs in the living room, his bedroom, and one in each of his kids' bedrooms. Sometimes the kids would watch TV in his room. He testified that he always kept the door to his room open if the kids were in there.

¶23.   He denied that he ever touched, fondled, or sexually touched Molly or Deanna. He denied touching any of the other children sexually. He denied ever being behind closed doors with the girls. He also denied that he had ever been alone in a bedroom with the girls. He further denied ever forcing them to touch his penis or to lie on top of him. He likewise denied putting his hand in their underwear or touching their breasts. He testified that he viewed the girls "as they were [his] own children. [He] treated them exactly the same. [He] basically helped raise them."

¶24.   On cross-examination, he claimed that Kate, Jane, Amy, Molly, and Deanna were all lying. But he admitted that there had been times when he was in his room with the girls. He claimed that the girls had all made up the story to help his ex-wife, Samantha, in her divorce. He testified that despite the charges against him, he had been able to see his children regularly.

¶25. The jury found Carr guilty of all four counts. Carr was sentenced to fifteen years on Count I, with seven years to serve and eight years suspended; fifteen years on Count II, with seven years to serve and eight years suspended, to be served consecutively to Count I; fifteen years on Count III, with six years to serve and nine years suspended, to run consecutively to Counts I and II; and thirty years on Count IV, with twenty years to serve and ten years suspended, to run concurrently with Counts I, II, and III, all in the custody of the Mississippi Department of Corrections.[3]

## ANALYSIS

¶26. Carr raises four issues on appeal. First, he argues that the trial court erred when it denied him funds to hire an expert in forensic psychology. Second, he argues that the trial court erred in allowing the State to present witnesses under Mississippi Rule of Evidence 404(b). Third, he argues that his conviction for fondling in Count III merges with the sexual battery conviction in Count IV. Finally, he argues that the trial court erred when it denied his motion for a statement of particulars.

### I. Expert Funds

¶27. We review the denial of expert funding for an abuse of discretion, recognizing that the decision must be made on a case-by-case basis. *Barnett v. State*, 192 So. 3d 1033, 1038 (¶17) (Miss. Ct. App. 2015). The United States Supreme Court has held that "a criminal trial

---

[3] The court ordered the terms to be served day-for-day and imposed post-release supervision.

is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). However, this does not mean that the "State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy[.]" *Id.* Rather, an indigent defendant is entitled to expert assistance when the "denial of such assistance would render the trial fundamentally unfair." *Lowe v. State*, 127 So. 3d 178, 181 (¶13) (Miss. 2013). The right to expert funds is "conditioned upon a showing that such expenses are needed to prepare and present an adequate defense." *Barnett*, 192 So. 3d at 1039 (¶18) (quoting *Green v. State*, 631 So. 2d 167, 171 (Miss. 1994)). The defendant must present "concrete reasons, not unsubstantiated assertions that assistance would be beneficial." *Brown v. State*, 152 So. 3d 1146, 1166 (¶90) (Miss. 2014).

¶28.    Additionally, "[t]he relative importance of the testimony offered by the State's experts is one factor to consider in assessing the fairness of the trial." *Id.* Where the "State relies on expert testimony alone to prove or corroborate an element of the crime, then the defendant is entitled to an expert to assist in his defense and preparation for cross-examination." *Isham v. State*, 161 So. 3d 1076, 1083 (¶33) (Miss. 2015).

¶29.    Carr argues that the trial court erred in denying his request for funds to hire an expert "[b]ecause the State's case heavily relied" on its expert's conclusion that the victims' statements were consistent with their allegations, and he suggests that the trial court erroneously focused on Carr's ability to hire his own expert because he had retained counsel.

But the trial court's order shows that it denied Carr's motion based on Carr's failure to "clearly show[] 'a substantial need or concrete reason'" that he needed a psychology expert "to adequately defend himself."

¶30. This was not an abuse of discretion. Carr's motion argued that the expert was necessary because of the State's questioning the witnesses at grand jury[4] and to "consider all of the circumstances in this case" and to "opine on a child's veracity when confronted by adult figures in authoritative settings." At the hearing on his motion, he argued simply that a psychologist "would be able to tell when a child is put in an authoritative situation or a high risk situation in front of an authoritative figure, they may have the propensity to lie or change their answers." This was not concrete enough to show a substantial need for an expert, and the trial court did not abuse its discretion by denying the funds.

¶31. Plus, the State's case did not hinge solely or even significantly on its expert's testimony. Jewell's testimony was not the sole connection between Carr and the crimes—the victims' testimonies were. Without Jewell's testimony, the victims' testimonies would have been sufficient for the jury to convict. Carr was also able to rigorously cross-examine Jewell on her methodology and conclusions as a forensic interviewer. He pointed out the discrepancies between Jewell's written reports and her testimony, effectively calling Jewell's

---

[4] At the hearing on Carr's motion, Carr asserted that Kate had changed her allegations during her grand jury testimony, and Carr's counsel suggested that the State had questioned her improperly in order to induce this change. The State vigorously disputed this allegation. The trial court ultimately determined the assistant district attorney who had questioned Kate had not made herself a necessary witness.

12

credibility into question as well as the victims' credibility.

¶32. The trial court did not abuse its discretion by denying Carr's motion for expert funds because Carr did not provide sufficient proof that an expert was required to rebut the State's case, and the denial did not render the trial fundamentally unfair because the State's case did not rely solely on expert testimony.

## II. Rule 404(b) Witnesses

¶33. Mississippi Rule of Evidence 404(b)(1) prohibits the use of "evidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). A trial judge's decision to allow this evidence is reviewed for an abuse of discretion. *Green v. State*, 89 So. 3d 543, 549 (¶15) (Miss. 2012). "Unless the judge abuses [his] discretion so as to be prejudicial to the accused, the Court will not reverse" his ruling. *Gore v. State*, 37 So. 3d 1178, 1183 (¶13) (Miss. 2010).

¶34. Our Supreme Court has held that "evidence of a sexual offense, other than the one charged, which involves a victim other than the victim of the charged offense for which the accused is on trial" may be admitted "if properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction." *Derouen v. State*, 994 So. 2d 748, 756 (¶20) (Miss. 2008). Rule 403 allows the court to

13

exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger" of unfair prejudice, confusion of the issues, or misleading the jury, among other things.

¶35. Carr complains that the trial court erred by allowing Molly and Deanna to testify that Carr had abused them because their evidence was "substantially more prejudicial than probative" under Rule 403. He argues that the State's remark during closing argument shows that the State intended to use Molly's and Deanna's testimony as propensity evidence.[5] He does not argue that the evidence was inadmissible under Rule 404(b), only that the evidence violated Rule 403 because it unfairly prejudiced the trial, confused the issues, and misled the jury.

¶36. We disagree. The trial court found that Molly's and Deanna's allegations bore "a clear and substantial resemblance" to the victims' allegations because they were abused around the same ages as the victim, they were also related to Carr, and they were touched in the same places. The testimonies support this finding and illustrate their probative value, which Carr does not contest.

---

[5] The State said at trial: "And the Judge told you about how you're supposed to judge the evidence that we put on, which we call 404(b) evidence. That was [Molly] and [Deanna]. What— they have nothing to lose here. The purpose of that evidence is to show you that Joshua Carr was a predator. He preyed on young girls that he could get his hands on at any given time." Carr did not object to this statement at trial. Even if he had, the statement is not entirely out-of-bounds. The Supreme Court has allowed similar evidence in as proof of motive: a "seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles." *Boggs v. State*, 188 So. 3d 515, 521 (¶18) (Miss. 2016) (quoting *Gore*, 37 So. 3d at 1186 (¶18)).

14

¶37. The trial court did not abuse its discretion by finding that the probative value was not substantially outweighed by the risk of unfair prejudice to Carr. Beyond pointing to the State's closing argument, to which Carr did not contemporaneously object, Carr does not explain how the probative value of Molly's and Deanna's testimony was substantially outweighed by the danger of undue prejudice.

¶38. Finally, the trial court gave a limiting instruction, instructing the jurors that Molly's and Deanna's testimony could only be considered "for the limited purpose of showing motive, intent, plan, lack or accident, or mistake" and that the jury could not "infer that the defendant acted in conformity with his previous acts and that he is therefore guilty" of the charged crimes.

¶39. The trial court did not abuse its discretion by allowing Molly and Deanna to testify about their abuse.

### III. Double Jeopardy Merger

¶40. We review de novo double-jeopardy claims. *Shoemaker v. State*, 256 So. 3d 604, 612 (¶30) (Miss. Ct. App. 2018). Carr argues that his convictions of Count III, which charged him with fondling Kate, and Count IV, which charged him with sexual battery of Kate, violate his right against double jeopardy because fondling is a lesser-included offense of sexual battery.

¶41. Carr argues that the Supreme Court's holding in *Friley v. State*, 879 So. 2d 1031 (Miss. 2004), prevents his conviction of both Count III and Count IV because the allegations

of Count III were indistinguishable from those of Count IV. In *Friley*, the Supreme Court held that it was not error to give a fondling instruction as a lesser-included-offense instruction to sexual battery because "[i]t is impossible to penetrate without touching." *Id.* at 1035 (¶15). But this Court has noted that this "general holding . . . is not absolute": "where sufficient evidence exists to support separate and distinct acts of fondling and sexual battery, separate indictable charges can properly stand without implicating jeopardy issues. This is so even if the criminal acts are closely connected or based on a common nucleus of fact." *Shoemaker*, 256 So. 3d at 613 (¶32) (quoting *Faulkner v. State*, 109 So. 3d 142, 147 (¶20) (Miss. Ct. App. 2013)).

¶42. Carr argues that this case is indistinguishable from *Stewart v. State*, 228 So. 3d 872 (Miss. Ct. App. 2017), in which this Court reversed and rendered a fondling conviction after finding a double jeopardy violation. However, in that case, the victim testified that the defendant touched her vagina with his tongue and that he put his tongue in her vagina; "there was no testimony the two acts occurred separately." *Id.* at 876 (¶13). This Court reversed and rendered the conviction because the State did not present "sufficient evidence . . . to support separate and distinct acts of molestation and sexual battery." *Id.* at 878 (¶20).

¶43. Here, the evidence supported two separate and distinct acts sufficient to support convictions of Count III and Count IV. Kate testified that there were numerous occasions when Carr touched her vagina and that at least once he digitally penetrated her labia. She testified that the assaults took place over the years; this is quite different from the victim's

testimony in *Stewart*, where the victim testified about only one incident. Because the State presented evidence of separate and distinct acts, there is no merger of Counts III and IV, and Carr's right to be free from double jeopardy has not been violated.

### IV. Indictment

¶44. We review de novo the legal sufficiency of an indictment. *Shoemaker*, 256 So. 3d at 610 (¶21). "[W]hether an indictment is fatally defective is an issue of law and deserves a relatively broad standard of review by this Court." *Id.* (quoting *Williams v. State*, 169 So. 3d 932, 925 (¶7) (Miss. Ct. App. 2014)).

¶45. "The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense." *Goff v. State*, 14 So. 3d 625, 665 (¶175) (Miss. 2009). "An indictment must contain (1) the essential elements of the offenses charged, (2) sufficient facts to fairly inform the defendant of the charge[s] against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Shoemaker*, 256 So. 3d at 610-11 (¶22) (quoting *Jones v. State*, 215 So. 3d 508, 510-11 (¶8) (Miss. Ct. App. 2017)). The Supreme Court has held that "a specific date in a child sexual abuse case is not required so long as the defendant is fully and fairly advised of the charge against him." *Jenkins v. State*, 131 So. 3d 544, 549 (¶14) (Miss. 2013). Two cases are instructive here.

¶46. In *Morris v. State*, 595 So. 2d 840 (Miss. 1991), the defendant's indictment alleged that he had molested his stepdaughter "over a cumulative period of one to two-and-a-half

17

years" when she was nine or ten years old. *Id.* at 841. On appeal, the defendant argued that the State's "failure to provide specific dates deprived him of the opportunity to present a convincing alibi to the jury." *Id.* at 841-42. The Supreme Court held that the due process required "that the defendant be given the specific date if at all possible[,]" and because the victim could not recall specific dates of the molestation five years after the fact, "the State could not narrow the time frame any more than it did." *Id.*

¶47.    In *Shoemaker*, this Court affirmed a similar conviction under an indictment alleging sexual abuse of a child over the course of two years. *Shoemaker*, 256 So. 3d at 611-12 (¶¶25-29). The victim in *Shoemaker* testified that "she could not say how many times the sexual abuse occurred or the exact dates on which it occurred because it happened 'a lot.'" *Id.* at 612 (¶27). We also noted that the testimony showed that the defendant and the victim "had constant interaction with each other during the period at issue," partly because they lived next door to one another. *Id.* at (¶28).

¶48.    Carr argues that his indictment failed to provide him with an opportunity to present a theory of defense because there were "no real grounds" on which he could defend himself beyond a blanket denial. He argues that if the indictment had contained more specific information, "he could have mounted a more specific defense to the allegations," but he stops short of explaining what that defense would have been.

¶49.    This was the appellant's argument in *Shoemaker*, and like in *Shoemaker*, we find that the State could not narrow the date ranges in the indictment any more than it already did.

18

Each victim testified that the abuse occurred many times, and none knew an exact date. They also all testified that they spent a lot of time with Carr and his family, which was supported by Jennifer's and Carr's testimony too. Carr's indictment provided him with notice sufficient to prepare a defense. Under these facts, the indictment was not defective.

## CONCLUSION

¶50. We affirm Carr's convictions and sentences for the three counts of fondling and one count of sexual battery.

¶51. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER AND WEDDLE, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**