# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01612-COA

NORRIS ALEXANDER A/K/A NORRIS CRAWFORD ALEXANDER A/K/A BUGGER

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/2019 |
| TRIAL JUDGE: | HON. JAMES McCLURE III |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | VACATED, REVERSED, AND REMANDED - 02/22/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Norris Alexander was seventeen when he stabbed his mother-in-law to death. In 1998, he was convicted of capital murder by a Panola County Circuit Court jury. The circuit court sentenced Alexander to life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections.[1]

---

[1] The State did not seek the death penalty in accordance with the wishes of the victim's family. The statute allowed a life sentence at the time, but Alexander had pled guilty to two other drug-related charges prior to his trial. The court sentenced him as a

¶2.     Following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), Alexander filed a motion for post-conviction relief (PCR) in 2015 for a *Miller* resentencing hearing.  The circuit court granted Alexander's motion and set the matter on the docket for a *Miller* hearing.  Prior to the hearing, Alexander's counsel filed two separate motions requesting funds to hire a mitigation specialist and a psychologist for purposes of investigating potential evidence for the *Miller* hearing.  The court denied both motions. Thereafter, a *Miller* hearing was held, and the State called as witnesses Alexander's former defense attorney and the detective who investigated the capital murder.  The defense called no witnesses.  After the court went through the required *Miller* factors, it sentenced Alexander to life imprisonment as a habitual offender.[2]

¶3.     On appeal, Alexander raises three issues: (1) the circuit court erred in denying his motion for funds to retain necessary expert assistance in the fields of mitigation investigation and adolescent development psychology; (2) the circuit court denied him due process by not resolving whether he was a rare, permanently incorrigible juvenile homicide offender; and (3) the circuit court deprived him of his constitutional right to have a jury impose his sentence.  After review, we find the circuit court abused its discretion in denying both of Alexander's motions for funds to hire experts when it held Alexander failed to show a

habitual offender.

[2] The issue of Alexander's habitual-offender status in conjunction with his *Miller* sentencing was heavily debated in the circuit court.  However, neither party raised this issue on appeal.

substantial need for a mitigation expert and psychologist.[3]   While the court held the

defendant failed to show a substantial need for any expert, we find it was an abuse of

discretion to deny funds for any experts under the circumstances of this case.  This Court is

not holding that a mitigation investigator or a child psychologist is required in every *Miller*

sentencing.  But under the circumstances of this case, and without mandating a certain type

of expert or the number of experts, some funds instead of no funds should have been

authorized by the court to assist in preparation for the *Miller* hearing.  Therefore, we vacate

Alexander's sentence and reverse and remand for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶4.     On August 27, 1997, Alexander was charged with the capital murder of his mother-

in-law at her home in Panola County, Mississippi.  In 1998, he was convicted of that crime

by a jury.  Before that trial occurred, Alexander pled guilty to two crimes of sale of

marijuana.  As a result of the previous felony convictions, the circuit court sentenced

Alexander to life without parole.  In 2012, the United States Supreme Court decided *Miller*

which essentially held that sentencing a juvenile offender to a **"mandatory"** life sentence

without the possibility of parole is unconstitutional. *Id*. at 465 (emphasis added).  In doing

so, the Supreme Court did not establish a uniform procedure for states to follow when

sentencing juvenile homicide offenders. *Id*.  But the Court did provide some guidance by

noting that mandatory life sentences prevent the court from considering a number of relevant

factors:

---

[3] Because we find the first issue dispositive, we decline to address Alexander's
remaining issues.

Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 567 U.S. at 477-78 (citations omitted). In *Parker v. State*, 119 So. 3d 987, 999 (¶28) (Miss. 2013), the Mississippi Supreme Court adopted the *Miller* factors and held those factors must be considered before sentencing.

¶5. As a result of the *Miller* ruling, Alexander filed a PCR motion to set his sentence aside so the required factors could be argued and considered by the sentencing court. The circuit court granted Alexander's PCR motion on July 30, 2015, and set aside his sentence from his original trial. Alexander was appointed a public defender to assist him at the new sentencing hearing. On October 30, 2015, the court signed an order allowing the public defender to withdraw because Alexander retained Ronald Lewis as private counsel.

¶6. On February 10, 2016, Lewis filed a motion requesting up to $10,000 in funds for expert assistance in the field of "mitigation investigation" for Alexander's *Miller* resentencing hearing. The motion stated in relevant part:

There is reason to believe that there is a substantial amount of mitigating evidence to uncover and present in this case, particularly in relation to "the family and home environment that surround[ed]" Mr. Alexander. Unfortunately, no mitigation evidence was presented at trial because the

4

[S]tate, at the conclusion of the liability phase, honored the victim's family's wish to forego the death penalty. Since the only alternative at that time was a mandatory sentence of life without possibility for parole, Mr. Alexander's trial counsel was foreclosed from putting on evidence of mitigating circumstances at the sentencing stage of his trial.

In order for undersigned counsel to prepare to put on evidence regarding "all of the circumstances set forth in *Miller*," at a re-sentencing hearing, and to uncover and present other relevant mitigating evidence, undersigned counsel needs the assistance of a mitigation specialist.

. . . .

The need for investigative assistance is especially strong in this case because of the passage of 39 years since the birth of Mr. Alexander and the extremely broad avenues of potentially relevant mitigating evidence.

¶7. Subsequently, on March 28, 2016, two days before a scheduled motions hearing, Alexander's counsel filed another motion requesting funds "not to exceed thirty thousand dollars ($30,000) for expert assistance in the field of adolescent developmental psychology and for a continuance to allow participation of expert in this case." To establish the need for the expert, the motion stated the following:

This court had a need for developmental expertise to consider relevant clinical information about Alexander's developmental status at age 17. Such an expert can provide valuable general information about adolescent development and evaluate Alexander to form an opinion and testimony about his developmental characteristics relevant for mitigation.

. . . .

While many records, including psychological records from Alexander's adolescence no longer exist, a forensic developmental psychologist can look to school records, which do exist, as well as evidence of lengthy in-patient treatment in a psychological hospital, to piece together a portrait of Alexander in his adolescence. Also, the expert can provide valuable assistance to the court in answering questions about the impact of environment upon adolescent development.

5

Counsel for Alexander never set either motion for a hearing, and the court never held one. Rather, the motions sat in the court file for three years, and Alexander's childhood history and mitigation evaluation investigation never occurred. On April 30, 2019, the circuit court entered an order denying both motions. The court noted that Alexander's attorney had failed to contact the court administrator regarding setting a hearing on the motions and therefore waived his "request for oral argument."[4] Further, the court denied the motions "on the merits," finding Alexander "neither established a substantial need for a psychologist[,] nor for a mitigation investigator" and failed to provide any "basis for his request for $30,000 for a psychologist." The court then set the *Miller* hearing for later that year. The record is silent as to why Alexander's privately retained counsel did not do some sort of mitigation determination between the April 30, 2019 order and the date of *Miller* hearing.[5]

¶8. Alexander's *Miller* hearing was held on September 24, 2019. The court was clear as to the purpose of the hearing by stating as an introduction that "the issue before the Court as to the defendant on resentencing on a *Miller vs. Alabama* hearing, is . . . whether he is eligible for a sentence life with parole or life without parole."[6]

---

[4] Defense counsel objected to this determination at the sentencing hearing and the court actually stated in its order that in March 2019 defense counsel "asked for hearing dates for the motions and asserting that setting the resentencing would be premature."

[5] At the September 2019 *Miller* hearing, defense counsel called no witnesses, offered no documents nor proffered any arguments within the *Miller* factors as to why Alexander should not be sentenced to life without parole.

[6] The issue the court sought to clarify was how the habitual-offender statute would apply to a *Miller* sentencing. That issue has not been addressed by the United States Supreme Court or the Mississippi Supreme Court. That issue, despite being briefed by the parties at the trial level, is not raised in this appeal. The sentencing statute for murder at the

¶9.    After the court's clarification, the State introduced two previous convictions of Alexander for the sale of marijuana. Those convictions occurred in January 1996 and April 1996, almost two years after the capital murder for which the court was holding a *Miller* hearing. Alexander pled guilty to those crimes before his original trial on the capital-murder charge. Defense attorney offered no objection to the certified copies of those convictions being introduced into evidence.

¶10.    The State then called two witnesses to testify. The first was William Travis, Alexander's trial attorney. During the State's questioning of his trial attorney, the following exchange occurred:

Q:    Is there anything that stands out about Mr. Alexander's ability to assist you in your representation that would be different than any other client?

A.    No, sir.

Q.    And you were not involved in the initial stages when he dealt with police officers; is that correct?

A.    No, sir.

Q:    Now, in regards to your ability to deal with Mr. Alexander, would you state to the Court—excuse me, would you address that issue for the Court?

A.    I recall no particular difficulties with myself and/or with Mr. Joe Van Dyke, my co-counsel.

Defense counsel did not conduct any cross-examination of Travis.

---

time of Alexander's crime set the sentence automatically at life, and the habitual-offender statute would have set that life sentence as being served without parole. So, presumably that "mandatory" sentence would fall within the confines of a constitutionally required *Miller* hearing. Apparently, based on that presumption, the court held the hearing.

¶11. The second witness the State called was Mark Whitten. Whitten was the individual who investigated the crime for which Alexander was convicted. Whitten testified that Alexander was "just shy of his [eighteenth] birthday" when the offense occurred, that Alexander's family were "good people," and that he was a father to a young child. Further, Whitten testified, without being offered as an expert, as to Alexander's mental and maturity level, life situation at the time of the crime, and "faculties" in the following exchanges:

Q. The second factor—excuse me. Did he seem to be a immature kid?

A. No, I mean, just a 17, 18-year-old kid.

Q. At any time did you feel like he was not appreciating the risk and consequences in this matter?

A. No, sir.

Q. To your knowledge was he in a difficult situation that he could not escape from?

A. No, I wouldn't think so, you are living with your mother-in-law.

Q. Did he appear to lack any faculties that would require you to be cautious about interviewing him?

A. None that I recall.

In addition to the above exchanges, the State literally read the *Miller* factor to the investigator and allowed him to opine as to its implication in the resentencing of Alexander, without objection from the defense counsel. As to the fifth *Miller* factor, potential for rehabilitation, the State offered a certified copy of a new seven-count indictment against Alexander which included crimes that allegedly occurred while Alexander was in the Panola County jail waiting for his *Miller* resentencing hearing. It is interesting to note that when

8

the court asked if defense had any objection to the document, the following response was given:

> For the record, the Court entered an order earlier stating that I had waived the right to put on evidence of sort that we're talking about here today, and there was no known waiver by me. I actually had given the court administrator several dates that I was available for a hearing, and I never got a response. And I have found out since then that that was because the court administrator was ill, and so they didn't get set. But I would like to make the record that **I did not come prepared to deal with the *Miller* factors, because I didn't have any evidence, because the Court denied my motion to have a psychologist**, which might not have occurred had I known when to have her in court. She was prepared to do so. But I just would ask the Court to strike all of this *Miller* testimony.

(Emphasis added). The objection was overruled, and the document was admitted. After a few more questions, the State then tendered the investigator for cross-examination by defense counsel. The following cross occurred:

> Q. Are you aware of any violent crimes committed by Norris Alexander since the death of his mother in-law?
>
> A. I am not.
>
> Q. He's never, ever been convicted of a violent crime, has he, since other than that one?
>
> A. Not to my knowledge. No, sir.

¶12. After considering the *Miller* factors, the circuit court sentenced Alexander to life imprisonment as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015), which prevented his parole eligibility. Alexander appealed.

## ANALYSIS

¶13. At the outset, we recognize that Alexander had a private attorney when he requested

9

a state-funded expert. However, a defendant does not automatically lose indigent status because he has a private attorney. *See Brown v. State*, 152 So. 3d 1146, 1169 (¶99) (Miss. 2014) (reversing a trial court's denial of expert funds, holding that the fact that Brown had a private attorney did not preclude him from obtaining state funds for an expert); *see also State v. Vaughn*, 279 S.W.3d 584 (Tenn. Crim. App. 2008). In the motion for funds to hire a mitigation expert, Alexander's attorney stated that "Alexander is indigent and cannot afford to retain the services of Mr. Wright or any other mitigation specialist." Notably, Alexander's indigent status was not a basis for the court's denial of both his requests for expert funds. Rather, the court held that "neither established a substantial need for a psychologist[,] nor for a mitigation investigator."

¶14. On appeal, Alexander claims that the court's ruling to deny him funds for expert assistance "deprived [him] of the basic tools to an adequate defense and ultimately denied him the right to a fundamental fair resentencing hearing." "The question of whether a defendant has a right to funds is a question left to the sound discretion of the trial court." *Moore v. State*, 287 So. 3d 905, 920 (¶60) (Miss. 2019). This Court should not "hesitate to reverse a trial court's denial of expert assistance to an indigent defendant **when the lack of expert assistance denied the defendant due process such that the trial was rendered fundamentally unfair**." *Lowe v. State*, 127 So. 3d 178, 181 (¶14) (Miss. 2013) (emphasis added) (citing *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991)).

¶15. "The United States Supreme Court has held that the '**basic tools of an adequate defense** or appeal' must 'be provided to those defendants who cannot afford to pay for

them.'" *Eubanks v. State*, 291 So. 3d 309, 316 (¶19) (Miss. 2020) (emphasis added) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). The United States Supreme Court further explained that "while the Court has not held that a State must purchase for the indigent defendant all of the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system[.]'" *Ake*, 470 U.S. at 77 (citation omitted).

¶16. In determining whether an expert is a basic tool for an adequate defense, the court considers three factors: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id*. "Under the first prong, the private interest involved is an individual's interest in accurate criminal proceedings, which is 'uniquely compelling' and heavily weighs in the individual's favor." *Isham v. State*, 161 So. 3d 1076, 1082 (¶26) (Miss. 2015) (quoting *Lowe*, 127 So. 3d at 182 (¶18)). Under the second prong, we must consider the governmental interest, which is pecuniary in nature "given that the county government must provide funds for a court-ordered expert." *Id*. at (¶27). However, that interest is "insubstantial" and is "outweighed" by the government's interest in obtaining a fair and accurate resolution in criminal cases. *Id*. "Finally, the third prong, which this Court analyzes the most intensely, requires the trial court to balance the probative value of expert

testimony for [Alexander] against the risk of not providing him expert assistance." *Id*. at (¶28).

¶17. "The determination of whether an indigent defendant must be provided expert funding is made on a **case-by-case basis**, and a defendant must demonstrate a substantial need in order to justify the trial court expending public funds for an expert to assist the defense." *Lowe*, 127 So. 3d at 181 (¶14) (citations and internal quotation marks omitted) (emphasis added). Here, Alexander claimed a mitigation expert was necessary for his defense so that his attorney could "prepare to put on evidence regarding 'all the circumstances set forth in *Miller*' at a re-sentencing hearing, and to uncover and present other relevant mitigating evidence." Alexander relied on the American Bar Association Guidelines, which state "[The] penalty phase preparation requires extensive and generally unparalleled investigation into personal family history. At least in the case of the client, this begins with the moment of conception." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, cmt. (2003) (citations and internal quotation marks omitted). He claimed that "[t]here is reason to believe that there is a substantial amount of mitigating evidence to uncover and present in this case, particularly in relation to 'the family and home environment that surround[ed]' [him]." Additionally, Alexander argued that investigative assistance was needed because he was thirty-nine years old, had been imprisoned for nearly twenty years, and "[e]very aspect of [his] life from conception to the present day must be investigated[.]"[7]

---

[7] While it is certainly recommended that exhaustive investigations occur as to mitigation, no court has ever held that the standard is to begin that investigation "with the

12

¶18. Alexander also claimed that an expert in the field of adolescent developmental psychology was necessary for his defense, arguing that "[s]uch an expert can provide valuable general information about adolescent development and evaluate Alexander to form an opinion and testimony about his developmental characteristics relevant for mitigation." He further argued that "the expert would have the ability to discuss the scientific research that supported the U.S. Supreme Court's presumptions about developmental immaturity of adolescents in the above cases, and particularly in *Miller*, which is most relevant in this case." Finally, Alexander claimed that a forensic developmental psychologist could look at the evidence regarding Alexander's "lengthy in-patient treatment in a psychological hospital . . . to piece together a portrait of Alexander's adolescence."

¶19. In denying Alexander's requests for expert funds, the circuit court relied on *Bass v. State*, 273 So. 3d 768 (Miss. Ct. App. 2018). Bass was a juvenile when he committed the crime of first-degree murder. *Id*. at 772, 774 (¶¶1-2). Before his *Miller* hearing, he requested funds for a mitigation expert and psychologist expert. *Id*. at 778 (¶32). Bass's request of a mitigation expert relied at least partly on his claim that "the defense required a social history investigation 'and that lawyers are trained in the law, not in conducting social histories.'" *Id*. at 779 (¶36). The circuit court granted Bass's request for a psychologist but denied his request for a mitigation investigator, finding that Bass failed to show a substantial need. *Id*. at 778 (¶32). The court explained that it was "'not persuaded that attorneys are so confined in their intellect, experience[,] and training that they are incapable of researching

moment of conception," as stated in Alexander's motion.

13

and reviewing the personal history of a defendant, determining what is pertinent and material to the issue . . . [,] and presenting such evidence to the court.'" *Id.* at 779 (¶36). Bass appealed and argued that the circuit court's denial prevented him from presenting his entire defense during sentencing. *See id.* at (¶37). On appeal, this Court found no abuse of discretion because "the circuit court's denial of expert funds for a mitigation investigator neither deprived Bass of the opportunity to present his defense during sentencing nor rendered his sentencing hearing fundamentally unfair." *Id.*

¶20. More recently, in *Moore*, 287 So. 3d at 920 (¶61), the Mississippi Supreme Court affirmed a circuit court's denial of a juvenile homicide offender's request for funds for a mitigation expert.[8] In doing so, the court stated that "[w]e have never held that expert testimony is required in a *Miller* hearing." *Id.* However, the court clarified, "This is not to say that a specific case may not arise in which expert testimony could be helpful and could be allowed." *Id.* We find Alexander's case qualifies as one of those cases.

¶21. As previously stated, this Court determines whether expert funding must be provided on a case-by-case basis. *Lowe*, 127 So. 3d at 181 (¶14). It follows that each defendant's situation and basis for his request is unique to the particular facts of that case, especially as it relates to a *Miller* hearing. Although *Bass* and *Moore* are instructive because they both

---

[8] The supreme court affirmed Moore's conviction but vacated his sentence of life imprisonment and remanded to the circuit court so that Moore could be resentenced by a jury pursuant to Mississippi Code Annotated section 99-19-101 (Rev. 2015). *Moore*, 287 So. 3d at 920 (¶61). Thus, the court stated that "given his resentencing before a jury—[Moore] may seek funds on remand should his counsel determine that an expert witness is warranted. If Moore does request funds, the trial court, of course, will still need to determine if Moore is entitled to them." *Id.*

dealt with juvenile homicide offenders, neither is factually identical to the present case. For example, the *Moore* decision does not detail Moore's basis for his motion for expert funds or the circuit court's basis for denial of that motion. So this Court is unable to examine the similarities and differences between the basis of Moore's motion for expert funds for a mitigation expert and Alexander's motion for expert funds for a mitigation expert. Further, *Moore* was remanded for a jury trial, and the issue of allowing an expert or not was reserved for the trial court on remand. *Moore*, 287 So. 3d at 920 (¶61).

¶22. The *Moore* court held that "where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial [or sentencing in this case] was thereby rendered fundamentally unfair" the appellate courts will "grant relief." *Id*. at (¶60). Here, Alexander's sentencing was fundamentally unfair and denied him due process. The defense had no witness to call. The defense had no information to attempt to explain mitigation under the *Miller* factors. The defense provided no documents to the court. As a result, the defense barely asked any questions. The defense explained to the court that the denial of expert assistance prevented him from being "prepared" for the *Miller* hearing.

¶23. Further, while Bass received expert funds for a psychologist to testify on his behalf at his *Miller* hearing, Alexander received no funds for either expert. Consequently, Alexander proceeded to a *Miller* hearing with no expert to aid in his defense. At the *Miller* hearing, the State presented two witnesses who testified about Alexander in relation to the *Miller* factors. In his order on the *Miller* factors, the judge repeatedly referred to the State's

15

witnesses' testimony and stated that Alexander "presented no testimony." In each *Miller* factor analysis, the judge weighed each factor against Alexander, noting for each factor that Alexander "put on no proof." However, Alexander was deprived of the opportunity to present testimony and proof to rebut the State's testimony because he did not receive funds for either expert. In fact, Alexander's attorney stated just that. At one point, he indicated to the court the denial of funds to hire experts to assist him in preparing for and presenting mitigation evidence prevented him from being prepared for the *Miller* sentencing hearing.

¶24. The dissent takes issue with the majority's finding that the *Miller* resentencing hearing in this case was fundamentally unfair by asserting that "Alexander and his counsel" failed to present any mitigating evidence. With all due respect, that is precisely the point the majority makes. As previously stated, appellate courts "should not hesitate to reverse a trial court's denial of expert assistance to an indigent defendant when the lack of expert assistance denied the defendant due process such that the trial was rendered fundamentally unfair." *See Lowe*, 127 So. 3d at 181 (¶14). Moreover, the Mississippi Supreme Court has held that "the burden rests with the juvenile offender 'to convince the sentencing authority that *Miller* considerations are sufficient to prohibit' a sentence of life without parole." *Wharton v. State*, 298 So. 3d 921, 927 (¶25) (Miss. 2019) (quoting *Jones v. State*, 122 So. 3d 698, 702 (¶14) (Miss. 2013)).

¶25. Here, Alexander's attorney asked the court for expert assistance to determine and prepare mitigating evidence for an individual who had been incarcerated for nineteen years. The goal of obtaining that expert assistance was to have witnesses who would be versed in

16

Alexander's history and be able to testify about that history to the sentencing court. The court denied Alexander's requests and provided him no assistance at all. As a result, the attorney announced to the court that he was not prepared for the *Miller* sentencing, called no witnesses, offered no exhibits, nor provided the court any mitigating evidence of any sort. Further, the attorney did not object to the State's witness, Investigator Whitten, offering opinions that were partly within the realm of the very expert Alexander sought. Simply put, the court's failure to provide an expert to assist the attorney in discovering and testifying to potential mitigating evidence contributed, in part, to the fundamentally unfair nature of the hearing.

¶26.   In considering the *Ake* factors, we find that Alexander presented a substantial need for some expert assistance in preparing for mitigation. Alexander was charged as a seventeen year old, convicted of capital murder at the age of twenty-two, and has spent over twenty-two years in prison. He did not have access to his psychiatric records, his school records, or any other records that an expert could find relevant. While Alexander may certainly be capable of relaying some event and information to his attorney, his attorney cannot testify in a proceeding in which he is acting as the attorney.[9] Further, the lawyer, while trained in law and the admission of evidence in court, is not trained in adolescent development and how particular life events may or may not influence a *Miller* factor. It follows that the lack of that expert assistance and the manner in which it affected the *Miller* hearing in this case denied Alexander due process, thereby rendering his hearing

---

[9] *See* Miss. R. of Prof. Conduct 3.7; *see also Graves v. Dudley Maples L.P.*, 950 So. 2d 1017, 1023 (¶¶23-24) (Miss. 2007).

fundamentally unfair. Therefore, we find the circuit court abused its discretion in denying Alexander's requests for expert funds.

¶27. To be clear, we do not find today that Alexander was entitled to $40,000 in expert funds or that he was entitled to both of the requested experts. "An indigent defendant does not have a constitutional right to hire an expert of his or her liking or to receive funds to hire his own." *Evans v. State*, 109 So. 3d 1044, 1049 (¶23) (Miss. 2013) (citing *Ake*, 470 U.S. at 83). Rather, instead of denying Alexander's motions altogether, the circuit court should have provided Alexander funds for an **adequate** expert to support his defense. *See Hunt v. State*, 687 So. 2d 1154, 1161 (Miss. 1996) (holding that an indigent's right to defense expenses requires the defendant to show such expenses are needed to prepare an adequate defense). Accordingly, we vacate Alexander's sentence and reverse and remand for proceedings consistent with this opinion.

¶28. **VACATED, REVERSED, AND REMANDED.**

**BARNES, C.J., WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR. GREENLEE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, P.J., GREENLEE AND SMITH, JJ.**

**CARLTON, P.J., DISSENTING:**

¶29. I respectfully dissent from the majority's finding that the circuit court abused its discretion in denying Alexander's motions for funds to hire experts. After reviewing the record, I find that Alexander's counsel failed to identify a substantial need for expert assistance. As a result, I find no abuse of discretion by the circuit court, and I would affirm Alexander's sentence. *See Moore v. State*, 287 So. 3d 905, 920 (¶60) (Miss. 2019).

¶30.    This Court reviews a lower court's decision regarding "whether a defendant has a right to funds" for expert assistance in the field of mitigation investigation for an abuse of discretion. *Id*. In so doing, we

> weigh[] on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair.

*Id*. (quoting *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994)). Relevant to the issue in Alexander's case, the supreme court has established that when requesting funds for expert assistance, "[a] defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial." *Id*. The supreme court has clarified that "[t]he Constitution does not require a State to furnish an indigent defendant with expert or investigative assistance upon demand." *Id*. (quoting *Johnson v. State*, 476 So. 2d 1195, 1202 (Miss. 1985)). Additionally, the supreme court "[has] never held that expert testimony is required in a *Miller* hearing." *Id*. at (¶61).[10]

¶31.    The record reflects that in February 2016, Alexander filed his motion for funds for expert assistance in the field of mitigation investigation. In his motion, Alexander requested "up to $10,000" to retain the services of mitigation specialist Mackey Wright. In support of his motion, Alexander claimed that "[t]here is reason to believe that there is a substantial

---

[10] In its opinion, the majority cites to a comment to Guideline 10.7 of the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, but I submit that the case before us is not a death penalty case. Our Mississippi caselaw is clear on the burden and requirements for requesting funds for expert assistance.

amount of mitigating evidence to uncover and present in this case, particularly in relation to [his] family and home environment." Alexander asserted that because no mitigation evidence was presented at his trial below, "[t]he story of Mr. Alexander's childhood has never been told." Alexander stated that his counsel needed the assistance of a mitigation specialist "[i]n order . . . to prepare to put on evidence regarding 'all of the circumstances set forth in *Miller*' at a re-sentencing hearing, and to uncover and present other relevant mitigating evidence." Alexander claimed that "[a] social history investigation is not within the expertise of a lawyer." Alexander further asserted that "[l]awyers are trained in the law, while investigators and social service workers are trained in conducting social history investigations." Alexander stated that "[t]he need for investigative assistance is especially strong in this case because of the passage of 39 years." He claimed that "[t]he investigation in this case is complicated by the fact that Mr. Alexander has been incarcerated for nearly twenty years, and many of the relevant mitigating witnesses, documents, and other evidence may be difficult to locate." Alexander maintained that "[e]very aspect of Mr. Alexander's life from conception to the present day must be investigated."

¶32. In March 2016, Alexander filed a motion seeking $30,000 in funds to retain Antionette Kavanaugh as a witness to provide expert testimony in the field of adolescent developmental psychology. In the motion, Alexander argued that the circuit court "has a need for developmental expertise to consider relevant clinical information about Alexander's developmental status at age 17." Alexander asserted that "[s]uch an expert can provide valuable general information about adolescent development and evaluate Alexander to form

20

an opinion and testimony about his developmental characteristics relevant for mitigation." However, Alexander failed to set forth in his motion whether he possessed a developmental issue that required expert assistance to investigate. Alexander also argued in his motion that Kavanaugh could examine Alexander's school records and records from his in-patient treatment at a psychological hospital "to piece together a portrait of Alexander in his adolescence . . . and provide valuable assistance to the court in answering questions about the impact of environment upon adolescent development."

¶33. Pursuant to the record, Alexander's motions requesting funds for experts were noticed for a hearing on March 31, 2016. Instead of offering arguments as to why he was in substantial need of expert assistance for the re-sentencing hearing, the record shows that at the hearing, Alexander made no arguments on the expert motions. Then, as stated by the majority, "the motions sat in the court file for three years, and Alexander's childhood history and mitigation evaluation investigation never occurred." Maj. Op. at ¶7.

¶34. On April 30, 2019, the circuit court entered its order denying Alexander's motions. In its order, the circuit court found that "Alexander has neither established a substantial need for a psychologist nor for a mitigation investigator. Also, Alexander gives no basis for his request for $30,000 for a psychologist." The circuit court acknowledged the responsibility of the States "to ensure defendants receive a fair opportunity to present their defense, including receiving expert assistance when the denial of such assistance would render a trial fundamentally unfair." (Citing *Barksdale v. State*, 176 So. 3d 108, 111-12 (¶18) (Miss. Ct. App. 2015)). The circuit court explained that "an indigent's right to defense expenses is

21

conditioned upon a showing that such expenses are needed to prepare and present an adequate defense." (Citing *Barnett v. State*, 192 So. 3d 1033, 1039 (¶18) (Miss. Ct. App. 2015)). The circuit court further clarified that the defendant must provide concrete reasons for requiring an expert and bears the burden of "demonstrat[ing] a substantial need in order to justify the trial court expending public funds for an expert to assist the defense."

¶35. After my review, I find that Alexander failed to meet his burden of providing the circuit court with concrete reasons for requiring expert assistance. Instead, Alexander offered "only unsubstantiated assertions that [expert] assistance would be beneficial." *Barnett*, 192 So. 3d at 1039 (¶18) (quoting *Harrison*, 635 So. 2d at 901). In his motion requesting funds for a mitigation investigator, Alexander argued that he needed the assistance of an expert to put forth evidence of Alexander's family and home environment, as well as his childhood. However, Alexander could have provided testimony about his home and family life at his *Miller* hearing. Alexander also failed to set forth why "any mitigating witnesses, documents, and other evidence would be difficult to locate" and require the assistance of an investigator. Regarding Alexander's claim that he needed the assistance of an expert in adolescent developmental psychology, I find that Alexander's counsel could have subpoenaed his school and medical records and offered these records as evidence at the *Miller* hearing without assistance from an expert. Additionally, as stated, Alexander failed to establish that he possessed a particular developmental issue that required expert assistance to investigate. I therefore find that the circuit court did not abuse its discretion in denying Alexander's motions.

¶36. Additionally, upon reviewing the transcript from the *Miller* hearing, I disagree with the majority's finding that Alexander's hearing was fundamentally unfair and denied him due process. My review of the hearing transcript shows that the circuit court provided Alexander with the opportunity to call witnesses and present evidence and testimony, but Alexander and his counsel failed to exercise his right to present evidence at the hearing. The record further shows that Alexander's counsel admitted to the circuit court that he came to the hearing unprepared to address the *Miller* factors:

> But I would like to make the record that I did not come prepared to deal with the *Miller* factors, because I didn't have any evidence, because the [c]ourt denied my motion to have a psychologist, which might not have occurred had I known when to have her in court. She was prepared to do so. But I just would ask the [c]ourt to strike all of this *Miller* testimony.

¶37. The majority opinion agrees with Alexander's assertion that "the lawyer, while trained in law and the admission of evidence in court, is not trained in adolescent development and how particular events may or may not influence a *Miller* factor." Maj. Op. at ¶26. However, the majority opinion fails to acknowledge that "[a]t a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." *Johns v. State*, 926 So. 2d 188, 196 (¶38) (Miss. 2006) (emphasis omitted). To be clear, this Court is not determining the issue of whether Alexander's counsel's performance constituted ineffective assistance of counsel. I recognize that no claim for ineffective assistance of counsel is before this Court in the present appeal. In applying our standard of review, as set forth above, I find that the trial court did not abuse its discretion in denying Alexander's motions for funds to hire experts. Therefore, I would

23

affirm Alexander's sentence without prejudice to his right to raise a claim of ineffective assistance of counsel in a motion for post-conviction collateral relief.[11]

**WILSON, P.J., GREENLEE AND SMITH, JJ., JOIN THIS OPINION.**

---

[11] *See Brisco v. State*, 295 So. 3d 498, 520-21 (¶¶63-64) (Miss. Ct. App. 2019), *cert. denied*, 293 So. 3d 834 (Miss. 2020) (affirming conviction and sentence but dismissing claims of ineffective assistance of counsel without prejudice to appellant's right to raise those issues in a properly filed motion for post-conviction collateral relief).